IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          15-CR-142-W

EDGAR DEKAY, II,

Defendant.

*UNITED STATES DISTRICT COURT*
*FILED*
*DEC 1 4 2016*
*MARY C. LOEWENGUTH, CLERK*
*WESTERN DISTRICT OF NY*

## PLEA AGREEMENT

The defendant, EDGAR DEKAY, II, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

## I.    THE PLEA AND POSSIBLE SENTENCE

1.    The defendant agrees to plead guilty to Counts 1 and 40 of the Second Superseding Indictment, which charge:

a.    In Count 1, a violation of Title 18, United States Code, Section 1962(d) (RICO Conspiracy), for which the maximum possible sentence is a term of imprisonment of 20 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3 years.

b.    In Count 40, a violation of Title 18, United States Code, Section 924(c)(1)(A)(i), possession of a firearm in furtherance of a drug trafficking crime, for which the mandatory minimum sentence is a term of imprisonment of 5 years and the maximum possible sentence is a term of life imprisonment such sentence to be served consecutively to

any other term of imprisonment, a mandatory $100 special assessment, and a term of supervised release of 5 years.

     c.     The defendant understands that the penalties set forth in this paragraph are the minimum and maximum penalties that can be imposed by the Court at sentencing.

     2.     The defendant understands that, if it is determined that the defendant has violated any of the terms or conditions of supervised release, the defendant may be required to serve in prison all or part of the term of supervised release, up to seven (7) years, without credit for time previously served on supervised release.

     3.     The defendant understands that the Court must require restitution to be paid to victims of the offense as part of the sentence pursuant to Sentencing Guidelines § 5E1.1 and Title 18, United States Code, Section 3663A.

## II.    ELEMENTS AND FACTUAL BASIS

     4.     The defendant understands the nature of the offenses set forth in ¶ 1 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crimes:

### Count 1

     a.     that there was an enterprise, as describe in the Second Superseding Indictment, consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

     b.     that the enterprise engaged in, or its activities in some way affected, interstate or foreign commerce;

c.    that the defendant was employed by or associated with the enterprise; and

d.    that the defendant knowingly and intentionally entered into an agreement that a conspirator would conduct, or participate in the conduct of, the affairs of the enterprise through a pattern of racketeering activity.

## Count 40

a.    that the defendant committed a drug trafficking for which he could be prosecuted in a Court of the United States;

b.    that the defendant knowingly possessed a firearm; and

c.    that the possession was in furtherance of a drug trafficking crime.

## FACTUAL BASIS

5.    The defendant and the government agree to the following facts, which form the basis for the entry of the pleas of guilty including relevant conduct:

a.    The Kingsmen Motorcycle Club ("KMC") was founded in Lockport, New York in 1959 and continues to operate today.  As set forth in the Second Superseding Indictment, the KMC is a criminal organization whose leadership, members, and associates constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, the activities of which affected interstate and foreign commerce.

b.    The purposes of the KMC included the following: promoting and enhancing the enterprise and its members and associates activities, including, but not limited to, distribution of controlled substances, maintaining premises for use and distribution of controlled substances, possession, use, and sale of firearms, sale of untaxed cigarettes, and other criminal activities including promoting prostitution; preserving and protecting the power, territory, and reputation of the enterprise and its members through intimidation, violence, threats of violence, assaults, murder, and attempted murder; placing victims, potential victims, potential witnesses, and others in fear of the enterprise, its members, and associates, through violence and threats of violence; and generating and maximizing the profits, reputation, and membership of

3

the enterprise from a variety of illegal activity including but not limited to drug trafficking, firearm sales, sale of untaxed cigarettes, sale of alcohol, gambling, robbery, and prostitution.

c.    The KMC operates in New York, Pennsylvania, Tennessee, and Florida. Each KMC member and chapter paid dues to the KMC National, which was located in the State of Florida. KMC Chapters routinely sold alcohol, and untaxed cigarettes for profits, which they attempted to mask by calling them "donations." The KMC also permitted gambling inside KMC Chapter clubhouses, and promoted unlawful "stripper parties" and sexual activities inside KMC Chapter clubhouses.

d.    The defendant, EDGAR DEKAY, II, was at various times KMC North Tonawanda Chapter President, a KMC Nomad, and the KMC National Nomad President. The defendant admits that, at various times during the RICO Conspiracy alleged in Count 1, KMC members and associates of the KMC used marijuana, cocaine, and other controlled substances in and around KMC Chapter KMC clubhouses. The defendant acknowledges that sometimes the KMC and its members and associates made efforts to ensure that KMC members, or civilians did not do drugs in open and notorious manner inside the clubhouse out of fear that such activity would cause law enforcement to investigate the KMC. However, the defendant acknowledges that, even with brief periods of diminished drug use, drug use and distribution continued to occur inside and around KMC clubhouses, including the North Tonawanda Chapter. The defendant further acknowledges that he knew that KMC members were involved in the use and distribution of cocaine, marijuana, and other controlled substances. The defendant further admits that he possessed firearms, and that KMC members maintained access to firearms, and KMC members possessed and maintained firearms on their person and inside KMC Chapter Clubhouses, including the North Tonawanda KMC Chapter clubhouse, in furtherance of a drug trafficking crime as charged in Count 40 of the Second Superseding Indictment. KMC members were also involved in firearm sales at various times. The defendant admits that the activities of the KMC, including sale of alcohol, cocaine and other controlled substances, firearms sale and possession, payment of dues, and the interstate activities and coordination by the KMC affected interstate commerce. The parties agree that after converting the amount of cocaine, marijuana and other controlled substances involved in the offense, at least 60 kilograms but less than 80 kilograms of marijuana is the amount involved in the defendant's relevant conduct encompassed in Count 1 of the Second Superseding Indictment which could be readily proven by the government against the defendant.

e.  The defendant further admits that the KMC followed a strict chain of command. David Pirk was the National KMC President, and Timothy Enix was the KMC Regional President of Florida and the Southeast from in or about 2012 through the time the defendant left the KMC in or about August 2014. The KMC chain of command involved the National President passing down orders to the Regional Presidents; Regional Presidents passed down orders to the Chapter Presidents; and Chapter Presidents passing down orders to Chapter Officers and members. KMC Nomads served at the discretion of the National President and/or Regional Presidents passing down orders from the National President. Furthermore, interstate coordination was maintained through cellular telephones, and also by a private KMC Facebook Group page administered and maintained by Timothy Enix.

f.  The defendant admits that, on or about September 21, 2012, he participated in a drive-by shooting in order to retaliate against a former KMC member who assaulted a KMC Regional President. On that date, the defendant, along with co-defendants Ryan Myrtle, Thomas Koszuta, and others, used firearms to shoot up the house of a former Kingsmen who beat up a KMC Regional President and who stole from the KMC. Thereafter, two pickup truck loads of KMC members, including the defendant, who was driving one of the vehicles, drove to the residence of the person, which was located in the Riverside section of Buffalo, New York. Several other armed KMC members opened fire at the residence, and the defendant drove co-defendant Ryan Myrtle and others away from the scene in Ryan Myrtle's Chevrolet Silverado. The defendant was not sure if the target was home during the shooting, and no injuries were reported to the authorities as a result of this shooting.

g.  The defendant admits that, on or about June 7, 2013, he and other KMC members agreed to "shutdown" the Springville KMC Chapter because members of that chapter were loyal to the former KMC National President, who was forced out of the KMC and replaced as National President by David Pirk. The defendant was not present when the "shutdown" of the KMC Springville Chapter occurred, but such "shutdown" was foreseeable to, and anticipated by, the defendant based upon conversations he had with other KMC members about the Springville KMC Chapter. During the "shutdown" of the KMC Springville Chapter, the FBI's investigation established that other KMC members including Gregory Willson, who was armed with a firearm, Ryan Myrtle, Tom Scanlon, Stanley Olejniczak, and many others, went to the Springville KMC Chapter. Once they entered the clubhouse, co-defendant Thomas Koszuta, and several others, told the Springville Chapter President, Victim B, that they were being "shutdown" and to turn in their patches. At that point, Thomas Koszuta struck Victim B forcefully in the head with a mag light, that is, a heavy duty flashlight.

Victim B was knocked out, and was bleeding from his head. Thomas Koszuta told Ryan Myrtle to make sure Victim B didn't move while other KMC members removed all of the property from the KMC Springville Chapter. Property removed from the clubhouse included U.S. currency, firearms, untaxed cigarettes, bottles of liquor and beer, t-shirts, and other KMC memorabilia. Victim B's cell phone, ring, and KMC patches were taken outside to a burn barrel and burned, while others bleached the areas where Victim B bled on the floor, and cut out sections of the rug to ensure they destroyed all evidence.

h. On August 3, 2013, while at a KMC party at Jack Wood a/k/a Snake's residence, members of the KMC received word that the former KMC Springville members, whose colors were forcibly removed by the KMC on June 7, 2013, were still wearing KMC patches and were taunting the KMC, and threatening the defendant. After learning that the former Springville KMC members were taking pictures wearing KMC patches taunting the KMC, and threatening the defendant, the defendant, EDGAR DEKAY II, and other KMC Nomads including Gregory Willson a/k/a Flip, Sean McIndoo a/k/a Professor, Thomas Koszuta a/k/a Kazoo, and another KMC Nomad decided to conduct a drive-by shooting. The defendant and his cohorts knew that the former Springville KMC members were having a cookout/party at the Springville KMC Chapter. The defendant, along with Gregory Willson a/k/a Flip, Sean McIndoo a/k/a Professor, Thomas Koszuta, and another KMC Nomad used Jack Wood's van, had several shotguns, and drove to the former Springville KMC clubhouse where they located the former members. At that point, they opened the sliding door on the side of the van and Sean McIndoo a/k/a Professor fired twice towards the group of former Springville KMC members who were outside. One of the shots from the shotgun struck a vehicle which was parked near where one of the targeted former KMC members was standing.

i. The above facts are set forth for the limited purpose of complying with Rule 11(b)(3) and are not intended to serve as a complete statement of the defendant's criminal conduct.

## III.   SENTENCING GUIDELINES

6.     The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

## BASE OFFENSE LEVEL

7.     The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2D1.8(a)(1), 2D1.1(a)(5), 2D1.1(b)(12) and 2D1.1(c)(10) apply to ¶5(d), above, and provide for a base offense level of 22.

8.     The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2A2.2(a), 2A2.2(b)(1), and 2A2.2(b)(2)(A) apply to ¶5(f), above, and provide for a base offense level of 21.

9.     The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2B3.1(a), 2B3.1(b)(2)(D), 2B3.1(b)(3)(A), and 2B3.1(b)(7)(A) apply to ¶5(g), above, and provide for a base offense level of 26.

10.     The government and the defendant agree that Guidelines §§ 2E1.1(a)(2), 2A2.2(a), 2A2.2(b)(1), and 2A2.2(b)(2)(A) apply to ¶5(h), above, and provide for a base offense level of 21.

## ADJUSTED OFFENSE LEVEL

11.     Based on ¶¶ 7 through 10 of this agreement and Guidelines § 3D1.4, it is the understanding of the government and the defendant that the defendant's combined adjusted offense level is 29.

## ACCEPTANCE OF RESPONSIBILITY

12.     At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines § 3E1.1(a) (acceptance of responsibility), and further agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines § 3E.1(b), which would result in a total offense level of 26.

## CRIMINAL HISTORY CATEGORY

13.     It is the understanding of the government and the defendant that the defendant's criminal history category is I.  The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase.  The defendant understands that the defendant has no right to withdraw the pleas of guilty based on the Court's determination of the defendant's criminal history category.

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

14.     It is the understanding of the government and the defendant that, with a total offense level of 26 and criminal history category of I, the defendant's sentencing range would

be a term of imprisonment of 63 to 78 months, a fine of $25,000 to $250,000, and a period of supervised release of 1 to 3 years for Count 1.

15.     The government and the defendant agree that Guidelines § 2K2.4(b) applies to the offense of conviction in Count 40 and provides that the Guidelines sentence is the minimum term of imprisonment required by statute.  The applicable statute, Title 18, United States Code, Section 924(c)(1)(A)(i), requires a term of imprisonment of not less than 5 years to be imposed consecutively to any other sentence of imprisonment, a fine of up to $250,000, and a term of supervised release of 2 to 5 years.

16.     Based on the above, it is the understanding of the government and the defendant that the aggregate sentencing range for defendant is a term of imprisonment of 123 to 138 months (60 months on Count 40 to run consecutive to 63 to 78 months on Count 1), a fine of $25,000 to $250,000 and a term of supervised release of 2 to 5 years.  Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the minimum and maximum penalties set forth in ¶ 1 of this agreement for both counts of conviction.

17.     The government and the defendant agree to the Sentencing Guidelines calculations set forth in this agreement and neither party will advocate or recommend the application of any other Guideline, or move for any Guidelines departure, or move for or recommend a sentence outside the Guidelines, except as specifically set forth in this agreement.  A breach of this paragraph by one party will relieve the other party of any agreements made in this plea agreement with respect to sentencing motions and

recommendations.    A breach of this paragraph by the defendant shall also relieve the government from any agreements to dismiss or not pursue additional charges.

18.    The defendant understands that the Court is not bound to accept any Sentencing Guidelines calculations and the defendant will not be entitled to withdraw the pleas of guilty based on the sentence imposed by the Court.

## IV.    STATUTE OF LIMITATIONS

19.    In the event the defendant's pleas of guilty are withdrawn, or convictions vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any other criminal offense involving or related to racketeering activity, the unlawful possession, manufacture, distribution or importation of controlled substances, and the unlawful possession, use, and discharge of firearms, which is not time barred as of the date of this agreement.  This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty pleas or vacating of the convictions becomes final.

## V.    GOVERNMENT RIGHTS AND RESERVATIONS

20.    At sentencing, the government agrees to take no position as to the specific sentence within the Guidelines range determined by the Court.

21.     The defendant understands that the government has reserved the right to:

a.      provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b.      respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government; and

c.      modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor.

22.     At sentencing, the government will move to dismiss the open counts of the Second Superseding Indictment as against the defendant.

23.     The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

## VI.    APPEAL RIGHTS

24.     The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed. The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 16, above, notwithstanding the manner

in which the Court determines the sentence.  In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.

25.     The defendant understands that by agreeing not to collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

26.     The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 16, above, notwithstanding the manner in which the Court determines the sentence.  However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## VII.    <u>FORFEITURE PROVISION</u>

27.    Upon the defendant's conviction under Counts 1 and 40, the defendant agrees to the forfeiture of all of his right, title, and interest in the following property pursuant to Title 18, United States Code, Sections 1963(a)(1) and 3665 against the following property:

a)    One (1) holster, .22 magazine with ammunition and miscellaneous ammunition, one (1) BB Bun, container of BBs and targets, recovered on or about August 26, 2015, from 322 Oliver Street, North Tonawanda, New York.

28.    The defendant hereby waives any right to notice of a <u>Preliminary Order of Forfeiture</u> and consents and agrees that it shall become final as to the defendant prior to sentencing and agrees that the Order shall be made part of the defendant's sentence and included in the Judgment pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure.

29.    The defendant further agrees to the entry of orders of forfeiture for the aforementioned property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of property is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

30.    The defendant agrees that the above-described property is also subject to forfeiture and waives any and all statutory and constitutional rights, including but not limited to time restrictions and notice provisions with respect to the final disposition or forfeiture of

the above property.  The defendant further agrees to the destruction of the firearm and ammunition described above.

## VIII.  TOTAL AGREEMENT AND AFFIRMATIONS

31.  This plea agreement represents the total agreement between the defendant, EDGAR DEKAY, II, and the government.  There are no promises made by anyone other than those contained in this agreement.  This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

JAMES P. KENNEDY, JR.
Acting United States Attorney
Western District of New York

BY:  _____
JOSEPH M. TRIPI
Assistant United States Attorney

Dated:  December 14, 2016

I have read this agreement, which consists of 14 pages.  I have had a full opportunity to discuss this agreement with my attorney, Emily Trott, Esq.  I agree that it represents the total agreement reached between myself and the government.  No promises or representations have been made to me other than what is contained in this agreement.  I understand all of the consequences of my pleas of guilty.  I fully agree with the contents of this agreement.  I am signing this agreement voluntarily and of my own free will.

_____
EDGAR DEKAY, II
Defendant
Dated:  December 14, 2016

_____
EMILY TROTT, ESQ.
Attorney for the Defendant
Dated:  December 14, 2016