UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA ) 15CR142
)
vs.
Buffalo, New York
GREGORY WILLSON, ET AL. ) March 17, 2017
Defendant. 1:15 p.m.
- - - - - - - - - - - - - - - - - X

**MOTION ARGUMENT**
**Transcribed from an Electronic Recording Device**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL J. ROEMER
UNITED STATES MAGISTRATE JUDGE

WILLIAM J. HOCHUL, JR., ESQ.
United States Attorney
BY:JOSEPH TRIPI, ESQ.
BRENDAN T. CULLINANE, ESQ.
Assistant United States Attorneys
138 Delaware Avenue
Buffalo, New York 14202

BARRY NELSON COVERT, ESQ.
Lipsitz, Green, Scime, Cambria, LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Appearing for Defendant A. Jenkins

TIMOTHY W. HOOVER, ESQ.
PATRICK E. FITZSIMMONS, ESQ.
REETUPARNA DUTTA, ESQ.
Hodgson Russ, LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
Appearing for Defendant T. Scanlon

COURT REPORTER: Karen J. Bush, Official Court Reporter
Karen_bush@nywd.uscourts.gov
100 State Street
Rochester, New York 14614

**CONTINUATION OF APPEARANCES**

MARK J. MAHONEY, ESQ.
Harrington & Mahoney
70 Niagara Street, Third Floor
Buffalo, New York 14202
Appearing for Defendant S. McIndoo

MICHAEL S. DEAL, ESQ.
DeMarie and Schoenborn, PC.
403 Main Street, Suite 615
Buffalo, New York 14203
Appearing for Defendant A. Jenkins

TERRY M. CONNORS, ESQ.
JAMES GRABLE, ESQ.
Connors LLP
1000 Liberty Building
Buffalo, New York, 14202
Appearing for Defendant T. Enix

JOHN PATRICK PIERI, ESQ.
Cornell Mansion
484 Delaware Avenue
Buffalo, New York 14202
Appearing for Defendant F. Caruso

JOHN J. MOLLOY, ESQ.
4268 Seneca Street
West Seneca, New York 14224
Appearing on behalf of Defendant J. Wood

MICHAEL STACHOWSKI, ESQ.
2025 Clinton Street
Buffalo, New York 14206
Appearing for Defendant S. Olejniczak

WILLIAM T. EASTON, ESQ.
16 W. Main Street, Suite 243
Rochester, New York 14614
Appearing on behalf of D. Pirk

CHERYL MEYERS BUTH, ESQ.
Meyers Buth Law Group, PLLC
21 Princeton Place
Orchard Park, New York 14127
Appearing on behalf of D. Pirk

USA VS. D. PIRK, ET AL.

MEHMET K. OKAY, ESQ.
The Okay Law Firm
P.O. Box 622
Batavia, New York 14020
Appearing on behalf of G. Stacharczyk

P R O C E E D I N G S

*   *   *

THE CLERK: Case No. 15CR142, United States versus Pirk. Parties, counsel, please state your name and the party you represent for the record.

MR. TRIPI: Joseph Tripi and Brendan Cullinane for the United States. Good morning, your Honor.

MAGISTRATE JUDGE ROEMER: Good morning.

MR. HOOVER: Hodgson Russ, Tim Hoover, Pat Fitzsimmons and Reeta Dutta for Tom Scanlon, who is present.

MR. CONNORS: Terry Connors and Jim Grable for Mr. Enix.

MR. PIERI: John Pieri for Filip Caruso.

MR. MOLLOY: John Molloy on behalf of Jack Wood, he is not present. He is aware.

MR. STACHOWSKI: Michael Stachowski for Stanley Olejniczak. He is here.

MR. COVERT: Barry Covert and Mike Deal for Andre

Jenkins. I don't think he accepted transportation, either.

MR. EASTON: William Easton and Cheryl Meyers Buth appearing for David Pirk.

MR. MAHONEY: Mark Mahoney for Sean McIndoo, Judge.

THE COURT: Good morning, counsel. Happy St. Patrick's Day for all of those who are believers. Mr. Molloy, you don't have a lick of green on.

MR. MOLLOY: I don't need it.

MR. STACHOWSKI: Again, neither does Mr. Mahoney. Mr. Molloy was going to wear orange.

MAGISTRATE JUDGE ROEMER: We'll start with Mr. Covert and get a scheduling order in place for your motions and a hearing date for your hearings.

MR. COVERT: Yes, your Honor.

MAGISTRATE JUDGE ROEMER: Government, about how much time?

MR. TRIPI: Judge, the motions that are being handled by Judge Wolford, we have a date to respond by April 3rd. I think that date would suffice for the portion of the motions that are before this Court as well. So, I would suggest April 3rd for the government's response.

MR. COVERT: Actually, I think we set it for April 7th.

MR. TRIPI: You're right, April 7th, Judge.

MR. COVERT: Our response is due on the 28th.

THE COURT: Mr. Tripi, I suppose you will be opposing the hearing on the motions?

MR. TRIPI: Yes, Judge. I haven't fully, obviously, fully briefed the issues yet, but I am anticipating opposing and I'll make my arguments in writing.

THE COURT: Let's go ahead and set a date for the hearing in the outside chance that I deny your request and we have a motion anyway, or a hearing anyways.

MR. TRIPI: Judge, briefly, in this one, as I understand the hearing as it relates to identification procedures.

MR. COVERT: And suppression.

MAGISTRATE JUDGE ROEMER: I think this is a suppression of a gun that was seized.

MR. COVERT: A gun that was seized in Darien, Tennessee or Georgia.

MR. TRIPI: There was a car stopped in Georgia as well. That would involve some coordination. I don't know the availability of that Georgia state trooper as I sit here today. But the other issues related to the identification procedures, a lot of that will be duplicative of hearings that were had in state court, so I may be submitting transcripts for the Court

to review in connection with our motion responses. So given all of that and the fact the Court may be conducting some transcript review in connection with our response, I suggest that you maybe set it a little further down the road than you normally would have if there weren't those issues.

MAGISTRATE JUDGE ROEMER: Mr. Covert?

MR. COVERT: That's fine.

MAGISTRATE JUDGE ROEMER: How would Wednesday, May 24th and Thursday May 25th be?

MR. TRIPI: That would work, your Honor. If for some reason, I don't anticipate a problem, but for if some reason the out-of-state witness would be unavailable, I'll promptly advise the Court to work on alternative dates.

MR. COVERT: We have no problem with those dates, and if Mr. Tripi has a need to move them, we'll coordinate with him.

MAGISTRATE JUDGE ROEMER: We'll start each of those dates at 9:30. And then I think what we'll do in your particular situation, we'll just do all of the motions that I'm going to handle at the same time, the non-dispositive motions.

MR. TRIPI: Yes, your Honor.

MAGISTRATE JUDGE ROEMER: So we'll set a date when that time comes the, just to make sure it's clear, Judge Wolford is handling the first, third, fourth, sixth and eighth

issues you raised.

MR. COVERT: That's correct.

MAGISTRATE JUDGE ROEMER: So everyone is on the same page.

MR. COVERT: Yes, that was the docket entry, yes.

MAGISTRATE JUDGE ROEMER: Anything else for Mr. Jenkins?

MR. COVERT: No.

MAGISTRATE JUDGE ROEMER: We'll go ahead with the oral argument on the non-dispositive motions. I think first we'll handle Defendant Pirk's request to maintain his second counsel. Mr. Easton, do you want to be heard on that?

MR. EASTON: Yes, your Honor. We last addressed this issue back in June, and I think since June, the posture of this case has changed considerably. The controlling legal principles are not in dispute here. And I think the factors are in order to remove counsel, it's certainly within the Court's discretion. But there are four factors you need to avoid. Disruption, and I believe that removal now will certainly cause disruption. Whether the case is unusually complex, which I think there could be really no argument in this particular case, especially in regard to Mr. Pirk who is the national president, that this case is unusually complex. At this juncture, there are 12 defendants on route to trial.

There are all sorts of issues. There are complicated discovery issues and a massive amount of discovery. And to remove a counsel right now for Mr. Pirk would certainly, in the context of the unusually complex nature of the case, it would certainly create disruption both to the defense team, to Mr. Pirk, his family and to the Court.

And the other factors are within the Court's discretion. And in this particular case, I believe what's gone on up to this point, as demonstrated, it's an extremely complicated case. And Mr. Pirk's position as national president of a multi-state RICO, according to the government, poses tremendous challenges on the defense. And Ms. Meyers Buth and I, between the two of us, are struggling to meet our challenges. I think also the Court should be aware that in this particular case, it implicates Sixth Amendment rights as well. It won't save -- I don't think it will save any money.

MAGISTRATE JUDGE ROEMER: I was going to ask you that because, basically, I was assuming that you were splitting up the duties between you. It's not that she is doing certain duties and you're doing the same duties or you're going to check on what she did, so to speak.

MR. EASTON: We certainly don't duplicate. We divvy up the case and delegate. And for one of us to then assume and relearn and learn for the first time what the other

one has done, it's not going to save any money, it's going to spend money. The travel costs alone for me to come to Rochester and Buffalo or for Ms. Meyers Buth to go to Rochester would eat up any de minimus saving here. There is no compelling reason to disrupt the team at this point. It will cause, I think, an incalculable disruption to scheduling, to Mr. Pirk's right to counsel to remove us at this juncture.

The other factor that I didn't bring up was whether the decision to not to seek the death penalty occurred late or early in the litigation. It did occur early in the litigation here. But I don't think that is really the dispositive factor here, especially in light of the fact that we've had two counsel here for nearly a year. And now to radically reconfigure the defense team at this juncture, I think, would be disruptive.

MAGISTRATE JUDGE ROEMER: Thank you, Mr. Tripi.

MR. TRIPI: Judge, I briefed the issue twice. Once in the initial motion to remove second counsel; once in my most recent. I'm not going to belabor the point. I think the Court has the salient information here. I would just note, this Court did order removal back in June of 2016. And as I understand it, only permitted second counsel to remain through the filing of motions. That has been completed. Hearings have been ordered at this point in time. It's a matter of moving

towards trial. There are already 12 other attorneys in the case. The defense are working in an organized group. They've joined in motions, they divided up motions, they joined in each other's motions. Most of them, almost all of them, are assigned at tax payer expense. I don't see the disruption argument. It's the same case, it's the same defense team working together. And all of the factors that compelled this Court to order removal in the first instance would be the same today. Thank you.

MAGISTRATE JUDGE ROEMER: Thank you.

MR. STACHOWSKI: I just want to add a little to that. We had a case that went on for about four years and Mr. Easton was involved in it --

MR. TRIPI: I would object, this is not Mr. Stachowski's motion.

MR. STACHOWSKI: Mr. Molloy was in that case. It was helpful because they divided things up and we divided other things up. When he suggests it saves money, they did division of preparation for trial as well, the two of them, Mr. Easton and his co-counsel. And it also helped at the end when it came to settlement time because we had extra people with -- Mr. Easton's client had the most exposure, as I recollect, and he was able to get us all together and we ended up resolving it during jury selection. So having that extra counsel was very

helpful. It was a RICO case just like this one and it had a lot of murders involved in it and drug dealing. So I thought it was very helpful to have that extra counsel.

MAGISTRATE JUDGE ROEMER: Okay.

MR. TRIPI: Mr. Stachowski's comment is just further evidence that in these multi-defendant cases, even lawyers who are not assigned to a particular defendant work together. He was talking about lawyers that weren't even assigned to him and benefited him. It goes to show you that they're all working at one time at tax payer expense.

MR. HOOVER: Judge, may I be heard on this even though it's not my motion?

MAGISTRATE JUDGE ROEMER: Sure.

MR. HOOVER: For the record, Tim Hoover. I wanted to add two things. One is, we represent Mr. Scanlon, pursuant to the CJA, the appointment is Mr. Oliverio, and we have -- and this is no secret, because everyone has filed a notice of appearance, two partners and two associates, not full time, because we all have different matters, working on this to provide adequate representation to Mr. Scanlon, who it's fair to say from the indictment, is differently situated than Mr. Pirk by counts and things like that. Secondly, I think it's important, the government can't have it both ways on this coordination on this issue. When we argued a motion on *Brady*

material, sometime last year, I argued it, Mr. Tripi made a big point of saying that, you know, I know how these motions work. Someone files them, but not everyone really necessarily joins. He was irked about what we said the government's understanding was or wasn't of its *Brady* obligations. You can't have it both ways here. The idea it's all one team or they are not working together. We have four people on the case. I believe Connors and Villardo has two or three people working. Now, they are retained, I understand. But the idea that one defense counsel per a defendant in the set of charges as complex as facing any of these defendants, let alone Mr. Pirk, I just thought that was relevant information as the Court assesses the motion.

MAGISTRATE JUDGE ROEMER: Thank you.

MR. TRIPI: Just a very brief response to that, Judge. I was not irked at the fact that counsel were joining and working together. I was irked, if that is a proper term, of the borderline personal attacks that I perceived from Mr. Hoover that I didn't think everyone else would have joined in, that's all.

MAGISTRATE JUDGE ROEMER: Okay. We're going to go now to discovery under Rule 16. There are motions pending regarding that. Somebody want to go first for the defense counsel? Don't feel like you have to argue everything. I've read all of the papers and I have a handle on the various

issues.

Mr. Hoover?

MR. HOOVER: If I could now, not on the discovery motions, per se, but the unsealing of the search warrant application, if that --

MAGISTRATE JUDGE ROEMER: That's a different topic I have.

MR. HOOVER: It is different. I don't have anything to add to the papers.

MAGISTRATE JUDGE ROEMER: Mr. Mahoney, you had something, but you wanted an inventory of -- you want to explain that?

MR. MAHONEY: Judge, what I was bringing to the attention of the Court in my motion and then in my reply to the government was that the big difficulty we have in federal discovery these days is that too often it stops with the government's representation that they've complied with the rule and the Court and the defense have no idea what the government has that it's not disclosing. And I think that takes sort of the judge out of the equation in terms of ensuring that Rule 16 is complied with. I just made the suggestion that, and I think it's the kind of thing that could be dealt with in a standing order, and it's not really about this case alone, it's certainly not any accusation about the good faith of the

government, but I think the only way, in an orderly way to decide discovery issues is have the government make it known the kinds of materials they have. And if there is anything they have they think is privileged work product or otherwise not subject to disclosure, they should specifically let us know and let the Court know about it so we can argue about it or, otherwise, give us everything. Because Rule 16 was amended by the Rules Advisory Committee a long time ago to require disclosure of anything that is material to preparing a defense. And the rules committee notes said at that time that it was -- their intention was that should include any discussion about *Brady* because the idea that anything is material to preparing for the defense would include things that are adverse things that are favorable and things that are in between. And to me, it seems to me it would make a much more simple and streamline way to address discovery in general and then the Court would be confident and the defense could be confident that there are not things in the government's possession or control that are really important to the case that are not privileged and not otherwise required to be disclosed, and then it would all be sort of above board and transparent. So that is my suggestion. And I point out specific examples of problems with that. I also raised an issue of how we deal with prior statements under Rule 26.2. I think that more scrutiny is required of that.

But otherwise, I've got it all in my papers, Judge.

MAGISTRATE JUDGE ROEMER: Okay, thank you. Mr. Tripi.

MR. TRIPI: Just very briefly, your Honor. Again, I've also responded in writing, so I'm not going to belabor the issues. I don't perceive Mr. Mahoney's motion as specifying any items in particular that he believes are being withheld or that won't be disclosed or haven't been already disclosed pursuant to Rule 16. Obviously, "give us everything," is not the standard. 3500 material, there is a different standard applicable to that. And then under Rule 16, I think it's (a)(2), there are certain reports and memoranda and internal documents that are not subject to disclosure. So, there is no rule that requires the government to give defense and the counsel an itemization of everything it has. We do make an effort to provide items in an orderly fashion. We can always do better in that regard. It's difficult when you get things at different times, but we try to provide discovery in a searchable format with cover letters that enable counsel to identify what's being disclosed. And I don't think there is any suggestion that the government has not or will not continue to comply with its obligations and that's really all I have to say on that.

MAGISTRATE JUDGE ROEMER: Okay, thank you. Should

have done this before. As far as I can tell, Mr. Brautigam is not here.

MR. TRIPI: I do not see him here.

MAGISTRATE JUDGE ROEMER: Is anyone covering for him?

MR. COVERT: I'm happy to appear.

MAGISTRATE JUDGE ROEMER: Mr. Catalano, anyone seen Mr. Catalano?

MR. DEAL: He is not. I'll appear for him.

MAGISTRATE JUDGE ROEMER: Mr. Deal will appear for Mr. Catalano. And Mr. Keefe?

MR. TRIPI: Mr. Keefe called me, your Honor. We have already, A, his client waived his appearance; and B, we've already litigated all of Mr. Keefe's motions and suppression hearings. And I believe the Court has already decided the suppression issues regarding his client, so he told me he didn't intend to be here.

MAGISTRATE JUDGE ROEMER: Good, thank you. Now we'll go to Rule 16 expert disclosures and scientific tests and reports. Anybody want to speak on that? Again, I'll consider it on the papers.

MR. TRIPI: Judge, we'll be submitting those disclosures in accordance with the pretrial order.

MAGISTRATE JUDGE ROEMER: Okay. Rule 12, in

particular, the Rule 12(b)(4)(B) notice of the government's intent to use any evidence.

MR. TRIPI: Judge, with every disclosure the government has made, and, again, in our responses, we have provided that disclosure.

MAGISTRATE JUDGE ROEMER: Witness statements.

MR. HOOVER: Judge, could I go back to the scientific tests? Not an argument as much as an inquiry.

MAGISTRATE JUDGE ROEMER: Sure.

MR. HOOVER: I've had conversations with Mr. Tripi where he has been frank that there are additional items in process and under way, in other words, there are more things to come. Maybe he can comment, if he wants, or if the Court wants him to comment, if there are scientific tests done, I'm not aware that there are, and they are done and completed, I think, under Rule 16, they have to be produced. In other words, it's not a matter of waiting for the pretrial order.

MR. TRIPI: No. Scientific testing that has been done has been disclosed. It is in the discovery that relates to --

MAGISTRATE JUDGE ROEMER: Try to speak in the microphone.

MR. TRIPI: I'm sorry. The scientific testing that has been done, the reports have been provided in

discovery.

MAGISTRATE JUDGE ROEMER: Is there still more scientific testing being done, to your knowledge?

MR. TRIPI: One thing, for example, the FBI is sending a hard drive down to Quantico. Local capabilities have been unable to do the analysis on a particular hard drive. So that is being sent down to experts in Quantico. It hasn't been accomplished yet in terms of the review and the analysis. That is one example of one thing they may not be able to give us any information or they may -- that is an example of something that is still on the way.

MAGISTRATE JUDGE ROEMER: I have several things listed: Controlled substance, there are no more controlled substance testing, that has all been provided?

MR. TRIPI: We are sending a couple of additional items to the laboratory. Those items were recovered from the North Tonawanda clubhouse. That hasn't been completed yet. A lot of them are prescription pills and marijuana and things like that that we're just sending for confirmatory testing.

MAGISTRATE JUDGE ROEMER: Firearms, ammunition, casings, are there any?

MR. TRIPI: Those reports have been provided.

MAGISTRATE JUDGE ROEMER: DNA testing.

MR. TRIPI: There have been DNA reports provided,

most specifically, as it relates of Andre Jenkins. Forgive me, I'm working off the top of my head. Gregory Willson, there is DNA in that regard. If any additional items are submitted for DNA, we'll get those reports turned over.

MAGISTRATE JUDGE ROEMER: But, to your knowledge, there is nobody testing for DNA at this point for DNA?

MR. TRIPI: To my knowledge. Forgive me if I'm forgetting, there is nothing in testing of DNA that hasn't been turned over.

MAGISTRATE JUDGE ROEMER: Was that helpful, Mr. Hoover?

MR. HOOVER: It is, Judge. Thank you.

MAGISTRATE JUDGE ROEMER: Grand Jury statements, in particular 3500 material, and, I guess, grand jury testimony would be 3500 material?

MR. TRIPI: Yes.

MAGISTRATE JUDGE ROEMER: And, Mr. Tripi, you want to respond to that?

MR. TRIPI: Judge, I responded in my papers. Just 3500 material will be disclosed no later than as it's required by law, but usually we're going to make efforts to do it much, much earlier. I've been in contact with Mr. Hoover. I do intend to work on a protective order that is tailored to 3500 material and I intend to get that out on a rolling basis well

before trial.

MAGISTRATE JUDGE ROEMER: Now, is it your policy generally that you turn over, like, FBI 302s at the same time?

MR. TRIPI: Yes. As a matter of policy, we turn those over as 3500 material.

MAGISTRATE JUDGE ROEMER: Okay. Anything from defense on that?

MR. HOOVER: Not from me, Judge.

MAGISTRATE JUDGE ROEMER: Any *Giglio*?

MR. TRIPI: Judge, we've argued quite a bit about that. We've argued twice before Judge Wolford. I think it would be safe to say there is a disagreement on some of what it means. Again, the government is turning over and will turn over *Brady*, exculpatory material, *Brady* material, as soon as we're aware of it.

MAGISTRATE JUDGE ROEMER: Mr. Hoover?

MR. HOOVER: There is a stark disagreement about whether *Giglio* is *Brady*. And we view that it is. I think what we can say, Judge, is it may be mooted in some respect if there is this turn over of 3500/*Giglio* that we're working on. I think the other thing we can say is, no one is filing it today, but there may be another motion filed on *Brady* based on things that may be filed.

MAGISTRATE JUDGE ROEMER: Mr. Okay. I want to

note Mr. Okay came in. He is here.

Mr. Okay, you made a request for internal affairs and personnel files of all law enforcement witnesses.

Mr. Tripi, did you want to respond to that request?

MR. TRIPI: Judge, obviously that disclosure would be improper. That is a request, essentially, for *Giglio* information that may be in the files of law enforcement personnel. The Court probably is aware that we have a procedure in place for that internally. We have a *Giglio* officer. Once we identify witnesses who are going to be testifying, the trial law enforcement witnesses, those witnesses -- a list gets provided to our *Giglio* officer, who, within our office, is Joseph Karaszweski, our appellate chief. He makes the inquiries of all of the law enforcement agencies. They return the information to him. If there is anything in those files, upon his request, he reviews the items in terms of whether or not they are subject to disclosure or in camera review and that is how that gets handled. Obviously we oppose cart blanche turning over law enforcement internal personnel files.

MAGISTRATE JUDGE ROEMER: Mr. Easton and Ms. Meyers Buth also brought up an incident related to the Chosen Few investigation. Are any of the agents involved in this case

the same agents that were involved there?

MR. TRIPI: No. Well, tangentially that was a FBI Squad 4 case, but if we're talking about the actual case agents that were assigned, no.

MAGISTRATE JUDGE ROEMER: Ms. Meyers Buth?

MS. MEYERS BUTH: Judge, my only request on that, if you recall the suppression hearing that Mr. Easton and I just had, the first agent in Florida who had taken a statement from Mr. Pirk, told me that he didn't mail his report back, that nowadays they E file the report and all of the case file materials are available to any of the agents working on the case via computer. So it's not just if Agent Jensen, who was one of the agents on the Chosen Few case, was active in the investigation of the Kingsmen, but it's also whether any of the agents relied on reports that he may have written because there was a finding in that case that Agent Jensen had not been forthright with the Court, and a couple of affidavits that he submitted: I think one Article 3 to Judge Skretny, and there may have been at least one more. So I appreciate the government's response and its indication that it will comply with its *Brady* obligation, but I would ask, because of the specific circumstances of the Chosen Few investigation done by the FBI Safe Streets Task Force, and because it overlapped in time with the Kingsmen investigation, that the government make

a specific inquiry to the FBI for any additional documents that may be *Brady*.

I'll give you an example. The Chosen Few investigation by the FBI went on from 2003 until the case was dismissed in 2011. This case is charged in the indictment from '06 to '16. There are affidavits in the Chosen Few case that reference either specific members of the Kingsmen or the Kingsmen Motorcycle Club and efforts that the Kingsmen Motorcycle Club allegedly was making towards keeping the peace with the Chosen Few. Mr. Easton and I put forth that if, for example, there were reports about the Kingsmen that pertained to their not being a one-percent club or they are not engaging in certain violent activities, that those may be *Brady* because they would be exculpatory, then, in contrary to the theory of the case that the government has put forth. Further, if our client, specifically Mr. Pirk, was not mentioned as taking part in any prior violent acts that the FBI may have been aware of through its joint investigation of both the Chosen Few and the Kingsmen during that time, that that may also constitute *Brady* depending on the substance. All I would ask is Mr. Tripi, who was not part of the Chosen Few case, make an inquiry to the FBI about what reports are available so somebody looks at those reports to see whether or not, in fact, there may be *Brady*. And if there is a question, those can be submitted to the Court

in camera. But certainly, the first, at least half of this case, we know from documents in the Chosen Few case that the Kingsmen were being investigated by the FBI, the same unit, even between '06 and '11 here at least. So I'm concerned because of the -- and I don't know if any of the other defense attorneys were involved in that case, there were specific allegations against agents that there was either mishandling of informants, that there was a lack of forthrightness with the Court. And so my interest, having come from that experience, I'm very, very concerned that there may, in fact, be documents about the Kingsmen that would constitute *Brady* that derive from that case.

MAGISTRATE JUDGE ROEMER: Mr. Tripi.

MR. TRIPI: Just briefly. Although this indictment dates back to certain conduct dating back to 2006, the FBI investigation of the Kingsmen did not begin until 2014. So there was not overlapping investigations as it relates to this case. But, I could also say that Agent Jensen had no involvement in this case. That was the agent that Ms. Meyers Buth referenced. But we will, I believe we've already done this, review internally, but we'll make sure it's done. And if there is any *Brady*, we'll bring it at least to your attention if we have a question about it or disclose it, if it is appropriate.

MS. MEYERS BUTH: Judge, you can't say it didn't have anything to do with this case. This case is charged from '06 to '16. We know from the Chosen Few investigation that the Kingsmen were being investigated by the FBI between '06 and '11. Now, my paper trail stops at '11 because that is when the Chosen Few case was dismissed because of governmental misconduct on the part of the agents, primarily, and I can't make a specific reference, but to say this investigation only started in '14 does not resolve this issue because things that they had investigated that maybe, whether it's 404(b) or direct evidence to prove these charges, may, in fact, be *Brady*. So it's the only point I'll make this morning, but I'm very, very -- I want to stress it because it was such an ordeal to get documents in that prior case that I know from reading the affidavits that there was an active investigation of the Kingsmen by the FBI. To say that this investigation is somehow separate from that, maybe it is, but that is inconsistent with the theory that has been set forth by the government in this case because they argued from '06 to '16, all of these activities were being undertaken. If they want to limit it from '14 on, I'm sure that will be fine with us. But until that is what they actually do, we're entitled to materials that predate that. And if the Court wants me to, I have some of the affidavits from the Chosen Few. I can submit those in a

supplemental motion so the Court can see the agents saying there is an investigation into the Kingsmen as opposed to me just representing that. I'm happy to do that. I could do it by Monday, if that would be helpful.

MAGISTRATE JUDGE ROEMER: Mr. Tripi, if Ms. Meyers Buth is willing to do that, wouldn't that assist you in your review of those documents?

MR. TRIPI: Sure, Judge. I mean, any information that she wants us to take a look at or provide the Court, we wouldn't be unaccepting of that. But all I was saying a moment ago, it's a different investigation and different investigative team and a different prosecution team. That is all I was saying.

MAGISTRATE JUDGE ROEMER: But, you know, I haven't researched this, but I suppose if there was some information came up in a separate investigation that is relevant to this investigation, I don't know what necessarily that information would be.

MR. TRIPI: Right.

MAGISTRATE JUDGE ROEMER: And it's in the possession of the government and the government knows that it has it, and say it's *Brady* or *Giglio* or for some other reasons disclosable, that the government would have a duty to disclose it, right?

MR. TRIPI: We don't disagree with that concept at all.

MAGISTRATE JUDGE ROEMER: Ms. Meyers Buth, you would be willing to do that early next week?

MS. MEYERS BUTH: Absolutely. I have to take a look, and, again, at the documents, it may be more appropriate to file the motion under seal, but I'll talk to Mr. Tripi about that before I make the filing on Monday.

MAGISTRATE JUDGE ROEMER: Okay, thank you.

MR. TRIPI: The one thing I should add, to the extent it was a different prosecution team and investigation team, for example, if there is a report from 2010 and someone was interviewed and they don't mention Mr. Pirk, that is not necessarily *Brady* if they weren't asking about Mr. Pirk. That is my only point.

MAGISTRATE JUDGE ROEMER: Okay. Next topic, disclosure of informant identities. Anybody want to add to what's in the papers?

MR. HOOVER: I have nothing to argue, rest on the papers.

MAGISTRATE JUDGE ROEMER: Okay. Rule 404(b), 608 and 609 evidence.

MR. HOOVER: I rest on my papers, Judge.

MAGISTRATE JUDGE ROEMER: Okay. Coconspirator

statements?

MR. HOOVER: Same.

MAGISTRATE JUDGE ROEMER: Unsealing of search warrants? I believe now the search warrants we're talking about are the search warrants for the clubhouses. Mr. Hoover?

MR. HOOVER: Judge, we had what was, I guess, a mini argument on this at one of the earlier appearances. And I think you hit the nail right on the head earlier when you told me to hang on because this isn't a Rule 16 issue. It's not a Rule 16 issue. It's an issue of there is a judicial document sitting in the courthouse on the second floor under seal that a different magistrate, at that time, presumably because of what was presented to him at that point, decided met the extremely high test, override the common law right of access, the first amendment right of access and the Second Circuit and the Supreme Court standard for sealing. That was anywhere from 7 to 18 months ago. My guess is it probably was a form order with an oral application without anything talking about the *New York Times* case or the *Pyramid Company's* case, et cetera. But the issue before you is not ordering the government to do anything, but whether the Court decides that it's going to unseal the document or you can do it different ways that doesn't result in unsealing at all. You can partially unseal. You can keep it sealed, but issue an order that it's directed

that gives it to defense counsel under the currently existing protective order or with a nod towards what I would call the generic government claim that there is some informant issue or something like that, an "attorneys' eyes only" protective order. So it's not a matter of ordering the government to do anything or to expose it to the world, although I think it's important to emphasize the standard is high. And there may be other cases where this motion could be made -- quick work could be made of it, but not here and not for Mr. Scanlon because he is charged in count 41 and count 45 with maintaining the Olean clubhouse for the purpose of dealing drugs and maintaining, along with a dozen or so other folks, the South Buffalo clubhouse for the purpose of dealing drugs. He has put in, and we put in on reply an affidavit or a declaration setting forth his standing, to the extent that is an issue on this motion, we don't think it is with regard to Olean. So we have in front of us, how can --

MAGISTRATE JUDGE ROEMER: Why isn't the standing an issue?

MR. HOOVER: What's that?

MAGISTRATE JUDGE ROEMER: Why isn't the standing an issue?

MR. HOOVER: Here is what I would say on the standing. For purposes of whether it should be unsealed or

not, I think the analysis doesn't bear on whether or not the person who is asking for the unsealing has standing to challenge. This could be Joe Public making the motion. What I would say, though, is the interest in the defendant in unsealing or release of it is even more compelling because he does have standing, if that makes sense. He doesn't need standing, no one needs standing to challenge.

MAGISTRATE JUDGE ROEMER: Why doesn't he have standing?

MR. HOOVER: In Olean? He has standing per the declaration that he submitted that he was a member of the Kingsmen, he was a member of the Olean clubhouse, he spent time there, et cetera, et cetera.

MAGISTRATE JUDGE ROEMER: But he -- it was a little confusing to me. There was some indication that they bought the clubhouse, but I wasn't sure if he was ultimately a part owner of the clubhouse.

MR. HOOVER: I don't believe he is on the title, Judge. I'm pulling up the declaration, but, yes, the group or the club purchased the clubhouse. I'm looking at, this is document 476-1, they renovated the clubhouse, they spent time there. I think he had an expectation of privacy there, so, to me, that equals standing.

MAGISTRATE JUDGE ROEMER: One of the cases cited

was the *Gotti* case for the Ravenite Social Club, and that seems to be contrary to your position.

MR. HOOVER: And maybe once I make my motion to suppress, after I have reviewed the affidavit, the Court will rule I don't have standing to challenge it. But my point here is, I don't need standing, I don't need to be a charged defendant, I don't need to be a defendant who had an expectation of privacy in Olean to make this motion or for the Court to consider what the other magistrate decided to do under seal. It could be a member of the public, it could be anyone. And the government --

MAGISTRATE JUDGE ROEMER: Your point is, you don't get up to bat unless you get it unsealed first.

MR. HOOVER: I don't get up to bat. And I suppose it's facially attractive for the government's argument that you can do it. I mean, you're not defense counsel.

MAGISTRATE JUDGE ROEMER: You mean in an in camera review here?

MR. HOOVER: An in camera review. You take a look at it and you determine whether or not there is probable cause. That is not the standard. Here the standard is whether there is a compelling government interest to maintain the seal and whether there are no lesser alternatives to maintain the seal or if there are some lesser alternatives. And when I say you

don't have to wholesale unseal it, that is what the alternatives are: Redacting it, partially unseal, and the one that makes the most sense and nods to the government's concerns that it says exist here are not unsealing it, but directing that the clerk provide it to the defense counsel under a protective order. When you look at the cases on the standard to seal, whether or not it was met the first time, they don't meet it here 18 months later by saying there is a generic informant concern. I only speak for Mr. Scanlon here, but about a year now that he has been under the charge and before the Court, we haven't -- he hasn't inappropriately dealt with any witnesses. We followed the protective order. We're not aware of anyone in the case inappropriately dealing with any witnesses. If you have that concern, if it's the concern that is at the tipping point, then direct that it be provided to the attorneys, attorneys' eyes only, and we'll review it that way -- and that way we can bring the motion or I can bring the motion challenging those seizures. Thank you.

MAGISTRATE JUDGE ROEMER: Thank you. Mr. Tripi?

MR. TRIPI: Judge, these search warrants were signed by Magistrate Judge Schroeder. There is one affidavit, master affidavit, in support of seven searches of some Kingsmen-related premises. He ordered that affidavit sealed based upon his findings in that affidavit with respect to

disclosure of an ongoing investigation, threats to witnesses. You can review the affidavit in camera itself and see what Judge Schroeder relied upon. But I think that, essentially, the argument here in Mr. Scanlon's papers is, essentially, that membership equals a privilege, a privilege to just cart blanche unseal documents, a Fourth Amendment privilege, and that simply is not the law. I'm a member of BJs, I don't have standing to contest a search of BJs. I'm a member of an Elks Lodge, I don't have standing to necessarily contest the search of an Elks Lodge, certainly not on the conclusory affidavit that Mr. Scanlon submitted, which basically says I'm a member. It gives the Court nothing more than that. So that is that argument that I just made is consistent with *Smith vs. Maryland*, the Fourth Amendment protects people not places. *Rakas v. Illinois*, Supreme Court case, the Court rejected a target theory of standing. So this is a standing issue because the documents have been sealed based upon a finding by a magistrate judge. So, our position is it's this Court's duty at this juncture to merely look at those documents and see if the magistrate judge who found probable cause or who issued the sealing order had a substantial basis to do so. And I think when you do that review, you'll find that he did. This is essentially an end around attempt.

MAGISTRATE JUDGE ROEMER: It's funny because I was

just going to say that it seems odd to me that to review these, review the affidavit to see if there was probable cause is, in a sense, conceding standing, and then making a determination that the search warrant was okay in the first instance.

MR. TRIPI: No, it's not conceding standing. I've argued quite clear, you don't even have to conduct the review. But if you do find there is some standing, which I don't believe Scanlon has established, for certain, even if you got to that point, that you don't need to unseal cart blanche all of the documents for seven clubhouses for people that have not asserted their rights. You can do what the Court needs to do without that disclosure, even partial disclosure, to the defense. And the end around point that I was trying to make was what one will find in that search warrant affidavit are essentially synopsis and summaries of witnesses that will testify at a trial. So the reason that everyone wants it disclosed is obvious and understandable from the defense perspective, but it's not the law. It's early disclosure of Jencks. It opens up a panoply of issues. Now we have confirmation a year before trial of who the witnesses are, especially if it's totally unsealed as has been suggested, then anyone can have access to the document theoretically. This issue, there is not one circuit case cited by the defense for the position that they are maintaining here. I've cited a

Ninth Circuit case in *Napier*. Hardly a base of conservative principle, said, essentially, the defendant does not have an absolute right to contest the veracity of information contained in the search warrant. That is essentially what they are asking you to find here, because they're a Kingsmen, they get a right to review the entire document when this Court doesn't need, quite frankly, anyone's help to review affidavits underlying search warrants, if you even determine that there is standing. *Cartagena,* a First Circuit case also denied disclosure of information that would tend to identify informants. It's a case that I have cited. Again, that is essentially what you would have here, and the affidavit might characterize witnesses as A, B, C, D, but it would be quite clearly of anyone with any type of knowledge of this case. Now that discovery has been provided and all things of that nature, it's not going to be hard to figure out who everybody is. And as I've mentioned, you've got to overlay that with the certain concerns, that is, Judge Schroeder didn't even have the benefit of. There was no indictment at the time. Judge Schroeder had the affidavits in 2015 prior to the searches in August of 2015. And he ordered it sealed at that point. Now we have an indictment charging things ranging from assault to murder, charging as a part of the enterprise's activities acts involving witness tampering. That only supports further the

need to continue the sealing. Now, there has been a finding by a grand jury that this is the type of activity that the enterprise engages in. These 16 members who were charged and the 12 that remain are a snapshot of the amount of members in this enterprise, which is in four states, maybe five by now. So, you can review the affidavits and make the determination that sealing is and was appropriate, and I think you should. Thank you.

MAGISTRATE JUDGE ROEMER: Mr. Hoover?

MR. HOOVER: Just in reply, Judge, was there a government written motion to seal originally? We don't know. Probably not. What order did Judge Schroeder sign at the original time of sealing? Probably a quarter page form, government order or maybe it was just oral. What findings did he make under *Pyramid Company*, *In Re New York Times*, the Supreme Court precedent that there was an extreme governmental interest and no other options, probably none, with all due respect, because it was just a general request by Mr. Tripi. What was the basis to seal the entire docket as opposed to just the search warrant affidavit? None. What is the basis under which Mr. Tripi is able to provide certain things and not others to the defense, all of which were originally sealed? I'm not sure. I don't know that he has gone back to get unsealing orders on those.

MR. TRIPI: Well, the affidavit.

MR. HOOVER: Excuse me, let me finish, please. What is the basis for continued sealing in this instance other than these generic concerns with regard to wanting it for trial access? I think he has got it the other way. He doesn't want to disclose because it impedes his trial preparation as opposed to it assisting ours. And in regard to it all being in one as opposed to seven, that is a decision that he or someone else made a long time ago. But what is the answer to how does it impinge theoretically governmental interest for it not to be unsealed, but to be provided to attorneys via an "attorneys' eyes only" protective order with this group of attorneys that this Court is aware of? None.

And, finally, Judge, and I know that you were on this committee that adopted local Rule 41. The idea of that rule, as I understood it, as a participating member and it eventually came out is not that things are sealed forever, it's that they were sealed, if there is -- there was a great or urgent need. And the bottom line is all this talk about standing and you review it, you got it exactly right. I'm going to review it for probable cause, but it, essentially, determines that there is standing and skips the process that can be battled out down the line once we make the motion once it is reviewed. The motion can be filed under seal, just like

Mr. Connors and Mr. Grable redacted the search warrant application for the Enix search in Florida.

And, finally, on standing, I don't mean to be repetitive. But this is posited as a litigation strategy matter between two adversaries. This is a judicial record access issue under which there is a heightened governmental or, excuse me, heightened public interest, First Amendment interest and common law interest all on top of the fact that he does have standing, if that is any consideration, and that he is charged with the maintaining the places he was searched at a time period during and at the time of the search for the purposes of dealing drugs. For us, it might be a hard, in some other instance, it might be different, in some other case, informant's identities, as far as being disclosed under Rule 16, is a different story. This is a very limited and basically comes down to how does the Court decide how it handles its judicial documents. Thank you.

MR. TRIPI: The items that were disclosed were the items that are unsealed, the search warrant application cover sheet, the search warrant itself, the search warrant return. Items that were sealed were not disclosed, quite simple. The standard is not that I want it for trial preparation. That is not the standard. Mr. Hoover can't cite one case that says that. The standard is not, "I want it because I want to make a

Franks motion or I want to see if I can make a Franks motion. That is not the standard, and this Court should deny disclosure based on what it has before it. The Second Circuit itself in the matter of *New York Times* says the First Amendment right of access, which Mr. Hoover, knowing he doesn't have standing and knowing that he hasn't established what he needs to, through other issues, is standing on this First Amendment right of access to public records. Well, the matter of *New York Times* says the First Amendment right of access to criminal proceedings is not absolute. Proceedings may be closed, and by analogy, documents may be sealed if specific on-the-record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that purpose. When you review the affidavit, your Honor, you'll find the same things that I'm confident that Judge Schroeder found in sealing it in the first instance and that you should not unseal it. Thank you.

MAGISTRATE JUDGE ROEMER: Thank you. Now, one of the places to be searched was Mr. Wood's house?

MR. TRIPI: Yeah, it was his house slash.

MAGISTRATE JUDGE ROEMER: And they made the garage into a clubhouse?

MR. TRIPI: Yes.

MAGISTRATE JUDGE ROEMER: Now, where are we on

that? Doesn't Mr. Wood --

MR. TRIPI: Mr. Wood, at the time I responded, hadn't even filed an affidavit. Initially I responded he has no standing. I would concede his affidavit, unlike Mr. Scanlon's, is sufficient, but only to those aspects. It's a lengthy seven location document, so I would submit that only items that relate specifically to his residence would be available to Mr. Molloy, and that could be provided in a redacted format. But, that is going to cut out a lot of the information.

MAGISTRATE JUDGE ROEMER: I just want to make clear, when you say to his residence, you're including the clubhouse?

MR. TRIPI: His residence was a clubhouse for a period of time.

MR. MOLLOY: All of the things that were seized were in the house, in my client's house.

MAGISTRATE JUDGE ROEMER: Okay. But I just -- you're including the garage as part of the house?

MR. MOLLOY: Yes.

MAGISTRATE JUDGE ROEMER: My understanding is that the big bar and everything was set up in the garage.

MR. TRIPI: Correct. So the disclosure to him should be limited and then redacted appropriately, and I can do

that. And if Mr. Molloy, it would be for his eyes only. If Mr. Molloy has an issue with that, he can take it to the Court, I would assume.

MR. STACHOWSKI: Judge, with respect to Mr. Olejniczak, I've been thinking about the need to see those documents myself because Mr. Tripi has made a point that Mr. Olejniczak's hunting guns, his father's hunting guns, his son's hunting guns, are really some -- has some nexus to the South Buffalo clubhouse because it was a close proximity of his house and they may have found guns. And maybe in that warrant, I might have some information that not only assists me in the suppression hearing, but also in any challenge that I might have that Mr. Tripi is trying to connect him to guns in that place because he happened to have hunting rifles in a safe in his house.

MR. TRIPI: Again, that is antithetical to what the Supreme Court councils that the Fourth Amendment protects people not places. So he hasn't even submitted an affidavit attempting to assert standing in that clubhouse. I ask the Court to deny that.

MAGISTRATE JUDGE ROEMER: Mr. Molloy, I'm sorry, you stood up like you were going to say something and I didn't --

MR. MOLLOY: I wanted to acknowledge it was my

client's residence.

MAGISTRATE JUDGE ROEMER: Mr. Hoover, did you want to add something?

MR. HOOVER: I just wanted to add, Judge, the jumping off point on this whole argument is these findings that Magistrate Judge Schroeder found. I don't ask Mr. Tripi questions, the Court does, but is there an order, is there a transcript of findings, does the order contain specific detailed findings as to each location searched? Does it contain citations to the applicable authorities? I mean, and you don't -- you obviously don't have to order Mr. Tripi to answer that question. We haven't seen it. And it seems to me that the idea that there is some super compelling basis, if it was just the, for lack of a better term, the standard seal, the search warrant is the place to start and whether the Court directs that to be released to us or unsealed, this is a unique and different case than all of these other instances and you should order it that it be produced to the attorneys.

MR. TRIPI: Maybe I'm jaded because I've only done these cases for nine years, so I don't see it as so unique and so different, Judge.

MAGISTRATE JUDGE ROEMER: Okay. Next is the motion to strike surplusage.

MR. GRABLE: Yes, your Honor. Mr. Fitzsimmons is

going to take the first part of the argument and I'll take the second part.

MAGISTRATE JUDGE ROEMER: Okay.

MR. FITZSIMMONS: Good morning, your Honor.

MAGISTRATE JUDGE ROEMER: Good morning, Mr. Fitzsimmons, or afternoon now.

MR. FITZSIMMONS: I guess it is the afternoon. Your Honor, this Court has the authority, under Second Circuit case law, to strike language from the indictment that is, (1) not relevant, and (2) prejudicial or inflammatory. And here, your Honor, paragraphs 2 through 24 of Count 1 of the introduction are simply that. They are the government's prejudicial statements that form no basis for any charge in the indictment. It's the government's inaccurate attempt to describe what the Kingsmen are about. And it's the government's attempt to inflame the jury and stain all of the defendants with generic criminal allegations before the trial even gets underway. And, your Honor, just to highlight a few examples of how these paragraphs are not relevant and how these paragraphs are prejudicial, I'm going to highlight for the court a few examples.

Your Honor, paragraph four states that the Kingsmen somehow intentionally omitted certain rules from its bylaws in the event that law enforcement came into possession

of them. Your Honor, this is a speculative statement of the mind-set of the drafters of the Kingsmen bylaws that has no relevance to the RICO conspiracy charge or any of the other charges in the indictment. And, your Honor, the concern here is similar to the concern in the *Malachowski* case, where in the *Malachowski* case, the Court feared that the government's use of the word "obliterated serial number" to identify a firearm in the indictment would cause the potential for jurors to infer that the defendant was seeking to avert law enforcement detection. And that is exactly what is going on here. The government is directly saying that. So the court in *Malachowski* found that is not relevant and prejudicial. And, your Honor, I would say the same thing here. Speculating as to the mind-set of the drafters of the Kingsmen bylaws as to what they intentionally left out is not relevant to any of the charges and it's prejudicial.

Example No. 2, paragraph 22, "that the Kingsmen members girlfriends were referred to as "old Ladies" and that the "Old Ladies" were loyal followers of club rules. Your Honor, referencing an alleged misogynistic nickname for club members' nicknames is completely irrelevant and unnecessary to any of the charges, Count 1 or any of the other counts. And the only purpose to include that in the introduction is to inflame the jurors, especially any female jurors that may be.

And, finally, Judge, paragraphs 23 and 24 are the government's attempt to conjure the negative connotation of the term "one-percent club." First of all, the allegation itself that the Kingsmen either attempted to become a one-percent club or did or whatever is entirely false in and of itself. But, more importantly, for this argument, your Honor, the term "one-percent club" and the use of that term and the government's recitation of the historical origin of that term have zero relevance to Count 1 or any other counts. And, your Honor, it's prejudicial because it's an attempt to unfairly suggest to the jury that associating yourself with the Kingsmen somehow makes you a criminal.

So, your Honor, those are just a few examples of how the paragraphs that we cite are irrelevant and both prejudicial.

Now, your Honor, the government claims in its responding papers that 2 through 24 tell the background of the Kingsmen or give the structure and the operations in the chain of command. But, your Honor, the government does that in paragraphs 25 through 30. So, paragraphs 2 through 24 are irrelevant, unnecessary and it is simply the government giving its prejudicial and inaccurate history lesson on the Kingsmen. And just with respect to what the government, the case law that the government tries to hitch its wagon to and how it's not

necessarily applicable here, the government hitches its wagon to *U.S. v. Scarpa*. I think in the closing argument of the government's papers it says, pursuant to *Scarpa* and its progeny, this is what they are really relying on. Well, in that case, the defense moved to strike the term "the *Columbo* organized crime family" from the indictment. And the government or, excuse me, the Court came back and said, "we're denying that motion because the use of that term is for purposes of identifying the enterprise because the enterprise in that case was the Scarpa crew." So the Court said that the use of that term was for identifying the enterprise, for making it clear and separating out the branch from the overall family. Right. Here we don't have that, Judge. Here we don't have an attempt by the government in paragraphs 2 through 24 to identify the Kingsmen as some kind of separate enterprise or separate entity for something. We simply have the government using paragraphs 2 through 24 to stimulate the jury's prejudices towards that may exist towards motorcycle clubs, that is what 2 through 24 are.

And, finally, Judge, just in closing, with respect to Thomas Scanlon, who Hodgson Russ represents, the government tries to claim that and bolster some kind of a relevance argument because 2 through 24 are then incorporated into other counts 12, 14, 15, 17, 19, 20. Your Honor, with respect to

Thomas Scanlon, he is not charged in any of those, so just to point that out for the Court, which we did point out in our papers.

MAGISTRATE JUDGE ROEMER: Okay, thank you. I'm not sure what part two is. I'm not sure if you should go now.

MR. GRABLE: Whatever your preference.

MAGISTRATE JUDGE ROEMER: What is it that you're going to argue about?

MR. GRABLE: I wanted to argue about *Scarpa* in particular.

MAGISTRATE JUDGE ROEMER: Why don't you and then Mr. Tripi can respond to the whole shebang.

MR. GRABLE: Thank you. First and foremost, we cited to a District of New Jersey case, Vastola, that I would submit is pretty analogous to our case. In that case, there is a preamble to a RICO indictment and the district court at 670 F Supp. 1256 through 1257 discusses why a motion to strike surplusage needed to be granted. In that case, we think that case is pretty analogous to this one. On *Scarpa*, I think it's an overly narrow view of *Scarpa* to say that, that the government's view, in particular, is overly narrow of it. And let me tell you why I feel that way and what I mean by that. *Scarpa*, which is 913 F. 2d 1013, and that is the particular pinpoint cite. I know that your Honor and all counsel in this

courtroom are familiar with *Scarpa*. I shepardized it last night. It's been cited over 1,000 times on motions related to striking surplusage. But what the case says is that the allegations should remain and not be stricken as surplusage if two things can be said about the allegations. No. 1, that they set forth something that is admissible that will be admissible at trial; and then No. 2, if, in fact, the evidence is not admissible and it's prejudicial, then it should be stricken in the indictment. The paragraphs we're talking about, paragraphs 2 through 24, I would submit to the Court, are not admissible. They are not going to be admissible at trial. And I'll give you a couple of examples in keeping with what Mr. Fitzsimmons did without running through all of them, but I think the analysis holds true for all of them. In particular, paragraph 12, and this is in the superseding indictment at docket item No. 33, page five, paragraph 12, it says, "KMC members were expected to follow orders issued by the national president, regional presidents, their own chapter president and other leaders within the KMC. These orders included committing acts of violence to include assaulting rivals and non-compliant KMC members, shootings and acts involving murder." A couple of interesting points about that paragraph and all of these paragraphs. They paint every defendant in this case with the same brush. It doesn't distinguish one defendant from another.

Now, Tim Enix, my client, is named in one overt act. He is named in overt act A-7, but everyone is in that one. The only one attributed specifically to him is paragraph 33. So with the broad brush of these paragraphs 2 through 24, they are all said to be guilty of what is described in, for example, paragraph 12. Now, how in the world is the government going to introduce admissible evidence at trial that Tim Enix was expected to follow orders if issued to commit acts of violence, to assault rivals, to commit murder, to conduct shootings? If that evidence were offered by the government at trial, Jenkins specifically, they put a cooperator on to testify to those sentences included within paragraph 12, every defense attorney in this room would stand up and object that it's not specific enough, that it should be, it should relate to a particular defendant, and, more importantly, that it violates Rule 704(b) that says, "a witness can't take the stand and say that a defendant possessed a particular intent." What that paragraph does is say to the jury that every defendant in this case possessed a certain mental state with respect to orders they received from KMC leadership. That is not admissible. It wouldn't be admissible at trial.

In paragraph -- I won't go into why it's prejudicial, it's obvious why it's prejudicial, but it's clearly not admissible. The paragraph that Mr. Fitzsimmons

referenced, paragraph 22, let me read that one, if I can. It's from docket item No. 33, page six, "Girlfriends and wives of KMC members referred to as 'Old Ladies,' were loyal to the club, followed club rules and assisted KMC members in criminal and other activities." Now, the government knows that Tim Enix's wife has no place in this paragraph. They have the proof, they know that their proof at trial won't come close to establishing that Tim Enix and his wife should be painted with that brush. There is no way that is going to be admissible at trial. If a cooperator takes the stand and tries to give that testimony within paragraph 12, the Court will surely sustain my objection to it and rule that the witness has to give more specific information about a particular defendant, for example, and that it's not admissible generally under 403 under all of the defendants in this case. The government doesn't lose anything with the loss of these paragraphs. They respond that they need these paragraphs in order to provide the framework of the conspiracy and set forth factual information that it intends to prove at trial. It won't be able to prove it at trial. And what they have in paragraphs -- in the overt acts, we didn't move to strike a surplusage. It's not surplusage, they'll either put that proof on at trial and prove the overt acts or they won't. And we'll fight about it in front of the jury when we give our summations. But the problem with these

acts at paragraphs 2 through 24 of the introduction is it's not going to be admissible as the government has set it forth. There is no way it's going to be admissible. But Judge Wolford, at the beginning of the case, is going to read each of the paragraphs to the jury and then she is going to give this indictment to the jury to take back into the deliberation room. I submit it will be lost on the jury by the time they begin their deliberations that this was not admissible if our objections are sustained and I believe they will be. So *Scarpa*, I believe, doesn't stand for the notions that the government cites it for. I think *Scarpa*, quite clearly, says at page 1013, that in the first instance, the paragraphs in question have to set forth evidence that will be admissible in trial and if it's not going to be admissible and it's prejudicial, then those paragraphs should be stricken.

MAGISTRATE JUDGE ROEMER: Thank you. Mr. Tripi?

MR. TRIPI: Thank you, your Honor. Well, I think, first of all, counsel is conflating relevant with admissible. The *Scarpa* case, which is the case which we'll hitch our wagon. Second Circuit is never a bad place to hitch your wagon. Quoting from *Scarpa*, they say, "Motions to strike surplusage from the indictment will only be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." The Court went onto

say, "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." So, paragraphs 2 through 24, these aren't just written out of whole cloth, these are grand jury findings. They are incorporated by reference into substantive counts and they are all relevant to the charged RICO enterprise, the charged RICO conspiracy and the other portion of it admissible, yes, they will be admissible. You don't need to have every line that is written here come out of one particular person's mouth. The grand jury takes the information in total and makes these findings. But relevant and admissible, paragraph one, "The Kingsmen was a motorcycle organization comprised of individual chapters located in various counties, cities and towns." And then it goes on and provides the locations; relevant, admissible. Paragraph two, "The KMC was started in or about 1959 in Lockport, New York, has structure, rules, chain of command, governed by written bylaws." And then quoting from those bylaws, actually, "KMC was one club not separate clubs divided by states or cities"; relevant admissible. How are the bylaws for the charged enterprise not coming into evidence? I'll be interested in that objection.

Paragraph three: "Members were expected to abide by the bylaws and failure to do so could result in punishment

ranging in fines, assault, expulsion from the organization. Expulsion from the organization being referred to as "out bad" at which times other members were to cease all contact with expelled members." That will be relevant and admissible, especially when you consider some of the acts of violence that happened later - drive-by shootings, assaults of former members, threats to former members and murders.

KMC imposed additional rules known to members but intentionally not written into the bylaws in the event law enforcement came into possession of them. Is that relevant, admissible? Sure it is.

Now, if Judge Wolford takes a different view, she'll take a different view. But I don't see how that is not coming in through witness testimony. One such unwritten rule is that members were not to speak to law enforcement. If it became known that a member talked to law enforcement, that member was subject to being expelled from the club. Again, unwritten rule. How are rules of the enterprise, whether written or unwritten, not relevant or not admissible? This explains what the enterprise is. And that is why it is specifically incorporated into no less than half a dozen other counts, substantive counts, of the indictment.

The KMC had a hierarchal range structure. I won't read the whole, paragraph, but that is going to be testimonial,

that is going to be in the bylaws. There is no way that that is not relevant and not admissible.

Paragraph six further lays out the chain of command, roles of the Nomads. Again, that is all information that will come in at trial.

Paragraph eight, there was an initiation process that is described there. Again, don't understand how that is not relevant and not admissible. Referred to each other by club names. That is going to come in. We start this investigation, you don't know anyone's real name, that will come into evidence. People call each other by club names. They are all referenced on the face sheet of the indictment everyone that has a club name. They paid monthly dues, which were divided between the local chapter and national chapter. There is an interstate affect on commerce requirement for RICO enterprise or that commerce would be affected. How is it not relevant or admissible that a multi-state organization has a dues-based system that spreads wealth around to various local, regional and national chapters?

Paragraph 11, they wore leather vests and jackets with the emblem on them referred to as colors and patches. That is going to be all over this case; relevant and admissible. And it provides a description of what the emblem is. We're not going to see photos of the KMC patches? I would

highly doubt that.

Paragraph 12, members were expected to follow orders issued by the national president, et cetera, et cetera, et cetera, that lays the framework for every crime of violence essentially that is followed in this indictment and specifically incorporated by reference into the various VICAR counts, assaults and murder. Those are 12, 14, 15, 17, 19 and 20. They were expected to attend mandatory parties. Well, that is testimonial. That is in the bylaws, too; relevant, admissible.

Expected to follow club rules. That is how the whole enterprise operated. We might as not have a trial if the government is not able to prove that. Paragraph 15, chapter clubhouses were maintained and entry and exit and egress was strictly controlled by the KMC. In one instance, just to give you an example, we'll have testimony from a witness who got beat to a pulp when she tried to leave a clubhouse. Seems to me when a particular charged defendant is charged with beating and raping her, that is relevant and admissible. And that will be repeated through many other witnesses. The finding that KMC maintained clubhouses with firearms and ammunition to defend against rival motorcycle gangs, there are photos of firearms, there are firearm seizures, there is testimonial evidence, all to that effect. There are multiple counts of 924(c) are in

this count as well. That is all over this case. It's relevant and it's admissible. So, so far everything we've covered is relevant and admissible and helps describe the enterprise. It's exactly what *Scarpa* says you don't strike.

KMC chapter clubhouses maintained untaxed cigarettes obtained from area Indian reservation, which were routinely sold for profit. Well, as part of the enterprise, which is defined later in additional paragraphs, one of the racketeering predicates is sale of untaxed cigarettes, that is a RICO predicate in this alleged conspiracy. So that is there, relevant, admissible and it's part of how the conspiracy functioned.

Eighteen, chapter clubhouses permitted elicit drug use and distribution, including cocaine, marijuana, controlled substances between club members, associates, friends and supporters. There will be a myriad of witnesses that testify about that. There are multiple substantive counts of maintaining drug premises at each Kingsmen location. I don't see how that is not relevant or admissible.

Paragraph 19, KMC clubhouses maintained a fully stocked bar with a wide selection of beer, liquor sales of which were utilized to generate income for the KMC. Again, this is a commerce requirement. Functioning as a de facto bar affects interstate commerce. Selling tequilas, vodkas that are

distilled out of state affects interstate commerce. Just another way that we'll be proving that this multi-state enterprise affected commerce; relevant and admissible. And not very prejudicial, either, I might add.

Paragraph 20, "KMC clubhouses maintained gambling devices and machines." Well, we seized them from clubhouses. It's part of the racketeering as well as they allowed illegal gambling in violation of law.

Paragraph 22, "Girlfriends and wives referred to as 'Old Ladies' were loyal to the club, followed club rules and assisted members in criminal and other activities. The members gave patches to their ladies signifying them as 'Old Ladies.'" There will be photos of those things. There will be references to people referring to so and so's old lady all throughout the testimony. The old ladies are specifically referenced and their role is defined in the KMC bylaws, essentially, and I'm paraphrasing, says you better control your old lady, you're responsible for her. You don't get multiple old ladies. You got to clear getting the patches to the old ladies. And we've recovered old lady patches, for example, in Melinda Enix's house. Again, that is relevant, admissible evidence. This is not -- there are times when member's phones are in female names, things of that nature, that is going to be all over this case. It's relevant and it will be admissible.

The references in paragraph 23 and 24, the one percenter reference, that will be referred to in this case as well. It's a finding by the grand jury, especially when you look at paragraph 24, excuse me, 23: In 2013, certain KMC members sought to establish the KMC as a one-percent club. Well, when you look at the acts of violence committed in this indictment, sure, there are some pre 2013, but I think a fair reading of this indictment is there was a lot more after 2013. Is that relevant? Is that helpful? Does that provide context? It certainly is going to be testimonial evidence presented at the trial. So I don't see how they get around *Scarpa*. I respectfully disagree. These are all good lawyers, you know. But if we have a debate at trial about a particular portion of evidence and its admissibility, there will be more than enough other items of evidence establishing each of these paragraphs that will come into evidence. For example, a Facebook message by Timothy Enix. He says "follow chain of command at all times." That is his client. He maintained the Facebook messaging to the private account. So using that, it's not hearsay, it's from his client, it's relevant and it's directed to the entire club. I don't see how Judge Wolford is not going to allow that. So, we totally disagree with striking the surplusage as claimed in paragraphs 2 through 24, which are all incorporated and would affect the grand jury findings in a

multitude of ways, not only stripping the introduction, but would affect the findings that are substantive, counts 12, 14, 15, 17, 19 and 20. Thank you.

MAGISTRATE JUDGE ROEMER: Thank you.

MR. GRABLE: Nothing is lost from those counts. The government -- and we set forth this information in our reply papers. Those substantive counts incorporate Count 1 all together. The problem with the overt acts and what I didn't hear, what I didn't hear Mr. Tripi say is, for example, paragraph 12, that the paragraph that he said, "et cetera, et cetera, et cetera" when he got to the part about every single Kingsmen member being expected to follow orders to commit acts of violence, including assault, shootings and murder, that was the et cetera, et cetera, et cetera part. I didn't hear how under Rule 704(b) that is going to be admissible against every single defendant in this case. It's not going to be. What I did hear Mr. Tripi do is run through each of the overt acts and provide, in certain circumstances, proof that he intends to introduce against individual defendants related to these paragraphs within Count 1. There is nothing says that if you grant the motion to strike as surplusage as it's not admissible as to against everybody that he can't introduce it as against particular defendants. Your striking surplusage under Rule 7(d) doesn't render the evidence inadmissible against

individual defendants. But what we have is much more analogous to the *Vastola* situation. I didn't hear anything about *Vastola* in the government's argument. It's not in their papers, either. And in *Vastola*, the Court says that a preamble to a RICO indictment should not contain additional information to what is alleged in the counts nor should it contain terminology that curries with it connotations of culpable behavior if under *Scarpa* it's not going to be admissible as against everybody.

And I'm not conflating relevance and admissibility. *Scarpa* says if the evidence of the allegation is admissible and relevant, then you move to the prejudice analysis. And I won't belabor the prejudice point, but it clearly has to be admissible. So what you see in all of these district court cases that have implemented *Scarpa* is the government does what it has done here, either in their papers or orally, they make a proffer. And almost every one of the *Scarpa* cases, the proffer establishes that the evidence is going to be admissible. The evidence set forth within a particular objectionable paragraph is going to be admissible. I would submit that what we gave you, Judge, at page 28 at our initial Memorandum of Law where we talk about the problem with very specific paragraphs, those paragraphs are all going to be inappropriate and should be stricken as surplusage because the government is not going to be able to put on any proof that

would establish that those paragraphs can be asserted generally against every one of the defendants in this case. And they lose nothing if those paragraphs are stricken other than Judge Wolford reading the government's allegations to the jury.

MAGISTRATE JUDGE ROEMER: Thank you, Mr. Grable.

MR. TRIPI: May I briefly respond?

MAGISTRATE JUDGE ROEMER: Briefly.

MR. TRIPI: I will. The standard is not "they lose nothing." The standard is as set forth in *Scarpa*. And, Judge, Mr. Grable is trying to say everything has to be a specific defendant has to have committed a specific act in a specific way. We're not talking about the overt acts, we're talking about the introductory 24 paragraphs. Like it or not, they are in a RICO conspiracy where they agreed, the enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. The objectives of the enterprise are all laid out and consistent with those introductory paragraphs, so, yeah, if you had an order to do something violent, the testimony and the evidence will show you better do it. So that's it.

MR. FITZSIMMONS: May I add one thing?

MAGISTRATE JUDGE ROEMER: Quickly.

MR. FITZSIMMONS: Your Honor, what I think the

case cited by counsel for Mr. Enix, the *Wilson* case, your Honor is instructive. Mr. Tripi ran through all of the paragraphs and was simply saying it's admissible, it's going to come in so you shouldn't strike it. But in *Wilson*, your Honor, I think it was instructive. There the Court looked at it and didn't really answer the admissibility question straight on, but said allegations in the indictment to this defendant transported 20 tons of C4 was irrelevant and unnecessary how many tons. So it's also kind of goes to the level of detail in these paragraphs becomes -- is it what makes it more prejudicial and inflammatory, so I just wanted to highlight that for your Honor.

MR. TRIPI: I'm not aware. I'm sure counsel will correct me if I'm wrong, but I'm not aware of one district court judge in this district interpreting *Scarpa* that struck the type of surplusage that they are seeking. Here I certainly didn't see it any of their papers.

MAGISTRATE JUDGE ROEMER: Okay. Request for grand jury transcripts and evidence. Mr. Okay, you requested that all grand jury transcripts, all evidence and testimony considered by the grand jury be provided to you.

MR. OKAY: Yes. That would come under Rule 3500 when that is turned over to us.

MAGISTRATE JUDGE ROEMER: So you were just asking

for 3500 material?

MR. OKAY: Essentially, yes.

MAGISTRATE JUDGE ROEMER: Okay.

MR. TRIPI: I'll rely on my papers, Judge.

MAGISTRATE JUDGE ROEMER: Plea agreements, pretrial service reports and presentence reports.

MR. GRABLE: Your Honor, it's my understanding that the government's position is not inconsistent with ours, and by that I mean they intend to provide the cooperation agreements, plea agreements, et cetera, within the 3500 material. And I read the government's response to our motion for an in camera inspection of the presentence reports to be that the government agrees that that is the appropriate Second Circuit standard, so we would ask that this Court issue an order directing that the presentence reports be provided to Judge Wolford sometime prior to the commencement of the trial.

MR. TRIPI: The only -- I don't think it's a disagreement, but that would be to Judge Wolford at that time as she directs. I don't think you need to order a timeline for them to give it to Judge Wolford. But you may have a different view, Judge.

MAGISTRATE JUDGE ROEMER: Well, I suppose I could order Judge Wolford to do all kinds of things. I'd rather doubt she'll do that.

MR. TRIPI: I defer that to Judge Wolford to do it on her timeline is I guess what I'm saying.

MAGISTRATE JUDGE ROEMER: I think that is all I have. Anybody have anything they want to add to the argument today?

MR. TRIPI: Not from the government.

MR. HOOVER: Judge, I'll stay here, it's short. On the point that Mr. Grable just raised, all of that is accurate and fine. There is a judicial document issue there, though. I mean, those plea agreements are ones that were presented to the court, Judge Wolford. And Judge Wolford, at least tentatively, accepted or went through a proceeding by which all of those people pleaded guilty, so maybe the Court wants us to take it up with her or the motion to be heard with her and that is okay, too. But the idea, again, of this wholesale sealing of documents for these pleas is not one that is consistent with the cases that we discussed in a different context. But in addition to being *Brady* and *Giglio* --

MAGISTRATE JUDGE ROEMER: I guess I'm having trouble following you. The plea agreements will be under seal?

MR. HOOVER: I think the reason I made the motion I think that was joined or Mr. Grable did as well, is the plea agreements of defendants in this captioned case have, for some reason, been sealed, instead of publically filed. And I don't

understand why that was. And so what we're saying is whether the government provides them or the Court unseals them or directs that they be provided pursuant to a protective order, that is the crux of the issue.

MAGISTRATE JUDGE ROEMER: Well, the plea agreements, they are going to be provided?

MR. TRIPI: Yes, Judge. Judge, what I can say is this. I think there is, quite frankly, a different procedure. I'm sorry, I think there is a different procedure in Rochester in terms of the way pleas are docketed. All of the pleas were entered in a public courtroom, the transcripts of the pleas are available. When Judge Wolford accepts a plea agreement or provisionally accepts a plea agreement where there may be cooperation provisions, she returns the document to the government for filing upon sentencing. So I think I need to just get some clarification from Judge Wolford.

MAGISTRATE JUDGE ROEMER: But, in any event, you're going to provide counsel with a copy?

MR. TRIPI: Yes, they will have those. I just need to get some guidance in terms of that.

MAGISTRATE JUDGE ROEMER: Okay.

MR. TRIPI: It was a Court procedure, it wasn't a government-induced procedure.

MAGISTRATE JUDGE ROEMER: Okay.

USA VS. D. PIRK, ET AL.

MR. HOOVER: Nothing additional, Judge.

MAGISTRATE JUDGE ROEMER: Okay. Anybody anything? Okay. Again, happy St. Patrick's day. Take care.

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s Karen J. Bush, RPR

Official Court Reporter