```
 1                  UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF NEW YORK

 3

 4

 5     - - - - - - - - - - - - - - X
       UNITED STATES OF AMERICA   )    15CR142
 6                                )
       vs.
 7                                     Buffalo, New York
       GREGORY WILLSON, ET AL.    )    October 24, 2017
 8              Defendant.             1:15 p.m.
       - - - - - - - - - - - - - - X
 9     MOTION ARGUMENT

10

11                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE ELIZABETH A. WOLFORD
12                  UNITED STATES DISTRICT JUDGE

12

13                  WILLIAM J. HOCHUL, JR., ESQ.
                    United States Attorney
13                  BY:JOSEPH TRIPI, ESQ.
14                    BRENDAN T. CULLINANE, ESQ.
                    Assistant United States Attorneys
15                  138 Delaware Avenue
                    Buffalo, New York 14202
16
                    HERBERT GREENMAN, ESQ.
17                  Lipsitz, Green, Scime, Cambria, LLP
                    42 Delaware Avenue, Suite 120
18                  Buffalo, New York 14202
                    Appearing for Defendant A. Jenkins
19
                    TIMOTHY W. HOOVER, ESQ.
20                  SPENCER DURLAND, ESQ.
                    Hodgson Russ, LLP
21                  The Guaranty Building
                    140 Pearl Street, Suite 100
22                  Buffalo, New York 14202
                    Appearing for Defendant T. Scanlon
23
       COURT REPORTER:    Karen J. Bush, Official Court Reporter
24                        Karen_bush@nywd.uscourts.gov
                          100 State Street
25                        Rochester, New York 14614
```

```
 1                    CONTINUATION OF APPEARANCES

 2                    MARK J. MAHONEY, ESQ.
                      Harrington & Mahoney
 3                    70 Niagara Street, Third Floor
                      Buffalo, New York 14202
 4                    Appearing for Defendant S. McIndoo

 5                    MICHAEL S. DEAL, ESQ.
                      DeMarie and Schoenborn, PC.
 6                    403 Main Street, Suite 615
                      Buffalo, New York 14203
 7                    Appearing for Defendant A. Jenkins

 8                    TERRY M. CONNORS, ESQ.
                       JAMES GRABLE, ESQ.
 9                    Connors LLP
                      1000 Liberty Building
10                    Buffalo, New York, 14202
                      Appearing for Defendant T. Enix
11
                      ANDREW BRAUTIGAM, ESQ.
12                    Brautigam & Brautigam, LLP
                      32 White Street
13                    P.O. Box 210
                      Fredonia, New York 14063
14                    Appearing for Defendant R. Osborne, Jr.

15                    JOHN J. MOLLOY, ESQ.
                      4268 Seneca Street
16                    West Seneca, New York 14224
                      Appearing on behalf of Defendant J. Wood
17                    & of Counsel for John Pieri for Defendant F.
                      Caruso
18
                      MICHAEL STACHOWSKI, ESQ.
19                    2025 Clinton Street
                      Buffalo, New York 14206
20                    Appearing for Defendant S. Olejniczak

21                    WILLIAM T. EASTON, ESQ.
                      16 W. Main Street, Suite 243
22                    Rochester, New York 14614
                      Appearing on behalf of D. Pirk
23
                      CHERYL MEYERS BUTH, ESQ.
24                    Meyers Buth Law Group, PLLC
                      21 Princeton Place
25                    Orchard Park, New York 14127
                       Appearing on behalf of D. Pirk
```

```
 1
 2                    MEHMET K. OKAY, ESQ.
                      The Okay Law Firm
 3                    P.O. Box 622
                      Batavia, New York 14020
 4                    Appearing on behalf of G. Stacharczyk

 5                    A. JOSEPH CATALANO, ESQ.
                      730 Main Street, 2nd Floor
 6                    Nigara Falls, New YOrk 14301
                      Appearing on behalf of Defendant J. Williams
 7
                      THOMAS J. EOANNOU, ESQ.
 8                    484 Delaware Avenue
                      Buffalo, New York 14202
 9
10                       P R O C E E D I N G S

11                         *         *         *

12

13

14              THE CLERK:  United States of America vs. Gregory

15    Willson, et al, 15CR142EAW.

16              THE COURT:  All right.  Good afternoon, everyone.

17              MR. TRIPI:  Good afternoon.

18              THE COURT:  So let's go through appearances.

19              MR. TRIPI:  Joseph Tripi and Brendan Cullinane for

20    the United States.  Good afternoon.

21              THE COURT:  Good afternoon.

22              I'll call out each of the defendants, confirm if

23    the defendant is here and who is here on his behalf.  David

24    Pirk is here.

25              MR. EASTON:  William Easton from Rochester; and
```

1    Cheryl Meyers Buth.

2              THE COURT:  Good afternoon.  Andre Jenkins is

3    here.

4              MR. DEAL:  Michael Deal and Herbert Greenman.

5              THE COURT:  Timothy Enix.

6              MR. GRABLE:  James Grable and Terrance Connors for

7    Mr. Enix.  Mr. Enix waives his appearance.

8              THE COURT:  Filip Caruso is here?  Good afternoon.

9              MR. MOLLOY:  John Molloy standing in for Mr.

10   Pieri, he is on vacation.

11             THE COURT:  Thank you, Mr. Molloy.  Jason

12   Williams.

13             MR. CATALANO:  Joseph Catalano for Mr. Williams;

14   he waives his appearance.

15             THE COURT:  All right.  Thank you.  Gregory

16   Willson.

17             MR. EOANNOU:  Tom Eoannou for Gregory Willson,

18   present.

19             THE COURT:  Thank you.  Robert Osborne is here.

20             MR. BRAUTIGAM:  Andrew Brautigam for Mr. Osborne.

21             THE COURT:  Good afternoon.  Mr. Stachowski.

22             MR. STACHOWSKI:  I'm here and Mr. Olejniczak is at

23   the end.

24             THE COURT:  Very good.  Jack Wood.

25             MR. MOLLOY:  Mr. Wood waives his appearance; John

1    Molloy on his behalf.

2              THE COURT:  Thank you, Mr. Molloy.  Thomas

3    Scanlon?

4              MR. DURLAND:  Spencer Durland and Timothy Hoover;

5    and Mr. Scanlon is in the back.

6              THE COURT:  Mr. Scanlon, I know you need to leave

7    for an appointment at some point, so whenever you need to

8    leave, feel free to do so.

9              Mr. Stacharczyck.

10             MR. OKAY:  Mr. Stacharczyck is in the courtroom.

11             THE COURT:  And McIndoo is here with Mr. Mahoney.

12             MR. MAHONEY:  Present, Judge.  Mr. McIndoo is in

13   the gallery.

14             THE COURT:  We're here to deal with the various

15   pending severance motions.  I'll state on the record what the

16   pending motions are and then we can deal with how we're going

17   to address them.  So, Mr. Pirk has filed a motion to sever at

18   docket 435.  He has filed a motion to change the trial location

19   at docket 434.  And then yesterday he filed a supplemental

20   motion at docket 833, which I know the government responded to

21   today.  Mr. Jenkins has filed a motion to change venue at

22   docket 522.  And, in addition, he has filed his additional

23   severance motion at docket 792.  And then this morning filed a

24   motion for joinder, and also seeking other relief at docket --

25   well, I don't have the docket number on what I printed out, but

1    it was filed this morning.  Maybe, Lisa, you can file that

2    docket number for me and I can clarify it on the record.

3              Mr. Of Caruso's motion for severance was filed at

4    being docket 776; Mr. Woods docket 777; Mr. Olejniczak filed

5    his amended motion at docket 784; Mr. Willson filed at docket

6    782; Mr. McIndoo filed his motion at docket 783; Mr. Stachowski

7    filed at docket 785; and Mr. Osborne filed his motion at docket

8    787; and Mr. Enix filed his motion at docket 790; and Mr.

9    Scanlon filed his motion at docket 791.  And, as I mentioned,

10   Mr. Jenkins filed his initial motion at docket 522, his second

11   motion at docket 792, and then the one from this morning was

12   filed at docket 836.

13             So, I guess, let me ask, from the government's

14   perspective, do you believe I've missed any of the pending

15   motions?

16             MR. TRIPI:  I don't think so, Judge.

17             THE COURT:  From the defense perspective, anything

18   that you think I've missed?  No, okay.

19             Let's address the pending motions this way.  First

20   of all, I know the government is now agreed that Mr. Caruso so

21   should be severed or its appropriate, you're not opposing his

22   severance?

23             MR. TRIPI:  Correct.

24             THE COURT:  Any defendant have an objection to Mr.

25   Caruso's severance?  All right.  So I am going to sever Mr.

1    Caruso from the rest of the case.  My plan is, as I indicated

2    in the text order that I issued about a week ago, I would like

3    to communicate to you today what I'm going to do with all these

4    pending motions.  My plan is to memorialize this, though, in a

5    written Decision and Order, because I think it's important to

6    be very clear as to why I'm doing what I'm doing.  But I will

7    sever Mr. Caruso.

8              The government also has indicated that it doesn't

9    object to Mr. Willson --

10              MR. TRIPI:  Williams.

11              THE COURT:  -- Williams being severed, correct?

12              MR. TRIPI:  Correct.

13              THE COURT:  And I guess Mr. Williams, though, has

14    not filed a severance motion.  Mr. Catalano, does Mr. Williams,

15    does he object?

16              MR. CATALANO:  No, he does not.

17              THE COURT:  He does not object.

18              MR. CATALANO:  No.

19              THE COURT:  Does any defendant object to Mr.

20    Williams being severed from -- being severed from, essentially,

21    the main case.

22              MR. DURLAND:  I don't have an objection per se,

23    but I do think that, depending on the logic of the decision to

24    sever or not sever, it would, at least potentially, whether Mr.

25    Williams would be in a second trial or first trial, I'm simply

1    stating that I don't necessarily agree that Mr. Williams

2    automatically should be in trial No. 2.  It really depends on

3    what rationale the Court is using to determine which defendant

4    goes in which group.

5              THE COURT:  Fair enough.  I can tell you right

6    now, I'm not persuaded by the defense arguments that the

7    so-called defendants who have alleged to have engaged in

8    violent conduct should be tried differently from the other

9    defendants.  This is one indictment, it is one alleged

10   conspiracy.  I don't view the defense arguments as persuasive

11   that, for instance, Mr. Scanlon's proposal as to how to divide

12   up this case.  My view is we should have a main trial.  The

13   question is going to be who is going to be part of that main

14   trial, and then we'll have another trial at some date after

15   that.  So your objection, I guess, is on the record.  But I'm

16   going to sever Mr. Williams as well from the main trial.

17             So, the additional defendant that the government

18   indicated it had no objection, I guess, to him being tried

19   with, if it comes to it, Mr. Caruso and Mr. Williams is Mr.

20   Wood.  And, I guess, I'd like some explanation from the

21   government as to why Mr. Wood as opposed to any of these other

22   defendants?

23             MR. TRIPI:  Yes, your Honor.  That was a tougher

24   call, obviously.  I framed our consent or however you want to

25   call it differently.  Understanding that the Court might want

1    more than a group of two, so looking at who the rest of the

2    people were on the docket, you had individuals who had some

3    connection to the homicides either directly, indirectly, as

4    facilitators or obstruction after the fact.

5              THE COURT:  Is your view that all of the

6    defendants except for Mr. Williams and Mr. Wood have some

7    connection to the homicide in one way or another?  I mean, in

8    other words, is your view at this trial there is going to be

9    evidence of this homicide for all of the other defendants other

10   than Mr. Williams or Mr. Caruso and, I guess, Mr. Wood?

11             MR. TRIPI:  Yes.  The only thing where Mr. Wood

12   intersects with some of the Nomads that were charged with

13   subsequent acts of violence related to his van's use in a

14   drive-by shooting.  So I viewed that as the easiest one to

15   sever and put in a secondary trial, for lack of a better term,

16   because there was really only one intersection.  Now, there

17   would be testimony at both trials that his residence was used

18   as a clubhouse and certain meetings were had there, but, again,

19   that wasn't enough, in my view, to preclude being able to try

20   him in a smaller group within the same sort of time parameters

21   that I outlined up to four weeks for a secondary trial.  I know

22   the Court posited in its inquiry to us, Mr. Stacharczyck, and

23   he would probably have been next on the list of people who

24   could be moved, but the difference there was there is a meeting

25   that occurs about a month after the homicides wherein a bunch

1    of Kingsmen members are meeting in the North Tonawanda

2    clubhouse with a couple other Kingsmen who had been subpoenaed

3    to testify in grand jury proceedings in state court and they

4    are sort of coaching the witness, and in going over what to

5    tell the grand jury, how to testify, things like that.  Mr.

6    Stacharczyck is in that group and can be heard on that

7    recording making statements to the effect of, "I hammered him

8    already, but I will hammer him again," meaning I'll go over it

9    with Williams before he testifies.  Williams, who is a

10   co-defendant here had been subpoenaed to the state grand jury

11   at that point in time.  So the logic was that, to put all of

12   that in context, at least to some degree, any trial with

13   involving Mr. Stacharczyck, we need to get into the murders

14   because that is the point of the obstructive behavior.

15            THE COURT:  But Mr. Williams, arguably, relates to

16   that, too?

17            MR. TRIPI:  He does, but he is on the receiving

18   end of it in terms of the coaching as opposed to the driver of

19   the narrative kind of.  So, if Williams is tried without

20   Stacharczyck, the same evidence very well may come in.  And I

21   suppose the evidence of the homicide may not need to go in as a

22   great a detail, but it would need -- the fact that there was a

23   homicide and the fact they were subpoenaed would need to be

24   presented.  So that is how I was grading them out.  After

25   Stacharczyck, though, I don't see anyone that could easily be

1    put in a secondary group.

2              THE COURT:  But the government would agree that

3    after Mr. Wood, Mr. Stacharczyck would be the next logical

4    person to try?

5              MR. TRIPI:  I would think so.

6              THE COURT:  If, in fact, hypothetically, I were to

7    sever Mr. Caruso, Mr. Williams, Mr. Stacharczyck and Mr. Wood,

8    what is the government's ballpark estimate as to the length of

9    that kind of trial?

10              MR. TRIPI:  Probably on the low end between two

11    and a half, three weeks; and on the high end, five weeks.  That

12    is my best guess right now, looking through the crystal ball,

13    five, six at the highest end.  On the lowest, maybe two and a

14    half weeks.

15              THE COURT:  Mr. Molloy, does Mr. Wood object to a

16    severance along those lines with either Mr. Williams or Mr.

17    Caruso or also Mr. Stacharczyck?

18              MR. MOLLOY:  No, your Honor, he won't.

19              THE COURT:  Mr. Okay, what is Mr. Stacharczyck's

20    view of this?  If you want to talk to your client before

21    answering that is fine?

22              MR. OKAY:  I would like to talk to him.

23              MR. TRIPI:  I would add, too, of those, Williams,

24    Caruso, Stacharczyck and Williams at one point.

25              THE COURT:  Williams, Stacharczyck, Wood and

1    Caruso.

2              MR. TRIPI:  Right.  Williams, Stacharczyck and

3    Caruso, three of the four, also were all members of the same

4    West Side Chapter at the same point, the proof of those drug

5    premises and those overt acts would overlap.

6              THE COURT:  Is there any other defendant that was

7    a member of that chapter, the West Side Chapter?

8              MR. TRIPI:  No, your Honor, other than the

9    deceased, no.

10             THE COURT:  Okay.  Mr. Okay, I'll give you a

11   chance to talk to Mr. Stacharczyck.

12             MR. OKAY:  Thank you.

13             MR. TRIPI:  Did the Court indicate Wood would be

14   severed?

15             THE COURT:  I haven't.

16             While Mr. Okay is out, let me ask a question that

17   doesn't apply, Mr. Tripi, to his client and that is, I believe

18   the government is taking the position that any one of these

19   defendants, whether it be Mr. Scanlon, Mr. Osborne, even if we

20   were to split it up, let's say, into two additional trials in

21   addition to this third, are you suggesting to me that each one

22   of those defendants would take along the lines of this 10 to 14

23   weeks to try the case?

24             MR. TRIPI:  Are you saying a single-defendant

25   trial?

1          THE COURT:  Let's say a single defendant trial.

2     Let's say I was to try Mr. Scanlon on his own or even Mr.

3     Osborne and Scanlon on their own, I can't imagine that each one

4     would be four months.

5          MR. TRIPI:  No.  But, individually, each one would

6     be a multiple-week trial in their own right, so it depends on

7     how many trials the Court would want.  Obviously, I'm opposing

8     it, for argument's sake, to try Mr. Scanlon alone or Mr.

9     Osborne.  Those are a couple-week propositions each defendant.

10          THE COURT:  But one of the instructions that I

11     understand the Second Circuit to give judges in cases like this

12     is to look at the extent to which carving out one or more

13     defendants would reduce not only the length of the so-called

14     main trial, but also result in a second trial that isn't going

15     to be as lengthy.  And is there any other defendant that could

16     be severed out from the main trial, as far as the government's

17     concerned, that would accomplish that objective?

18          MR. TRIPI:  Judge, I really don't believe so.

19     Because, as you look at, for instance, you're using Scanlon and

20     Osborne as examples, their conduct is obstruction and accessory

21     after the fact as charged to the murders.  We're really going

22     to be getting into the depths of the murders.  As you recall

23     from detention arguments and other arguments, they are both

24     connected to the Olean clubhouse which was integral before and

25     after to the murders.  So those two would be essentially

1    repeating, to a large degree, the homicide trial and their

2    connection to the Olean chapter.  In addition to the other

3    aspects of the conspiracy that delved beyond the role of the

4    conspiracy, the acts of the nomads, same thing, there are

5    violent acts to the other group that goes to the heart of what

6    culminates in these murders, so to take that out of the heart

7    of the case, that conception and chronological void would still

8    need to be filled, whether the Nomads who did other shootings

9    and violent acts are in the trial or not, you have to explain

10   that stuff, otherwise it's disjointed.

11            You have Pirk in charge and the murders happened,

12   there is a lot of stuff that happened in the middle that the

13   other defendants do in the course of that build up to the

14   murders.  And then the people who covered it up or obstructed

15   after the fact.  If you don't have the lead up, the murders

16   makes no sense and then the cover up makes no sense.  So from

17   our vantage point, it really would very much be repeating the

18   same trial.  Once you get past some of these other defendants

19   who I believe we could manage and have say an 8/4 split; even.

20   A main trial and a secondary trial or something along those

21   lines.  But I think once we get much beyond Mr. Stacharczyck

22   here, we're, yeah, sure, could a second trial be eight weeks

23   and the main trial be twelve weeks?  Probably.  So I don't know

24   if that achieves the goal of the Court.  Though it still ties

25   the Court's calendar up for 20 weeks instead of 12.  So --

1          THE COURT:  Okay.  Mr. Okay, what is Mr.

2     Stacharczyck's position?

3          MR. OKAY:  He would have no objection to being

4     severed, your Honor.

5          THE COURT:  Thank you.  I'll be very up front with

6     what I'm thinking of doing and that is to sever, obviously I've

7     indicated of severing Mr. Caruso and Mr. Williams.  And my plan

8     or my thought is that I should also sever Mr. Stacharczyck and

9     Mr. Wood.  So we would have four defendants who are outside of

10    the main defendant trial, which leaves us with eight

11    defendants.  I know we have an issue with Mr. Jenkins and the

12    appeal that is pending, I want to hear argument about that.

13    But I want to also hear from all of the remaining defendants

14    who would be left in this eight-defendant main trial as to why

15    you believe that that is not workable or what I'm proposing to

16    do doesn't make sense.  So, my suggestion is, save the argument

17    regarding Mr. Jenkins and then also the argument about the

18    location of the trial for the end of this, and let's deal with

19    the remaining seven defendants who I'm proposing to try as part

20    of the main trial.

21          One of my views of this, or, I guess, how I am

22    approaching this is related to who are the defendants in

23    custody, and then, in addition to that, I don't see that you

24    can try Mr. Pirk without Mr. Enix.  And I don't see that you

25    can try Mr. Scanlon without Mr. Osborne.  And so the eight

1    defendants who are left would basically be all of the

2    defendants who are in custody, plus Mr. Pirk -- or Mr. Enix and

3    Mr. Scanlon.  Am I misstating any of that, Mr. Tripi?

4              MR. TRIPI:  No, your Honor.

5              THE COURT:  But if Mr. Scanlon, you want to make

6    the argument first, I know he is here and has to leave soon.

7              MR. DURLAND:  Your Honor, thank you.  Certainly

8    the other defense counsel can address their clients, but we

9    discussed that I would, at first, discuss why it is that, you

10   know, I think an 8/4 split that your Honor is proposing is both

11   impractical and I don't think serves the purposes of severance

12   and joinder that your Honor correctly described just a moment

13   ago.  And, really, I think what we're talking about at this

14   point is should Mr. Scanlon and Mr. Osborne go in this second

15   trial or with the --

16             THE COURT:  Would you agree that logistically that

17   Mr. Osborne and Mr. Scanlon need to be tried together or should

18   be tried together?

19             MR. DURLAND:  I don't necessarily agree with that,

20   your Honor, because to be sure, they both have this connection

21   to the Olean clubhouse.  That is really a superficial

22   connection that doesn't translate to the types of concerns of

23   the cases that discuss joinder and severance are talking about.

24   And you could always come up with superficial reasons why one

25   defendant or another defendant is related to, say, the

1    homicides.  And let me take Mr. Tripi's point about, well,

2    Scanlon and Osborne are both connected to the homicides after

3    the fact, and, therefore, all of the evidence with respect to

4    the homicides is going to have to come in.  First off, Mr.

5    Scanlon is not charged with being an accessory after the fact,

6    that is Mr. Osborne only.  In that respect, the two defendants

7    are different.  And certainly if your Honor is concerned about

8    pretrial incarceration, moving Mr. Scanlon to the second trial

9    while Mr. Osborne is in the first would make sense on that

10   measure, also, although Mr. Osborne is in the best position to

11   decide whether he would prefer severance or a speedier trial.

12   But in terms of whether all of the evidence of the murders is

13   going to be necessary, I emphatically disagree with that.

14   Certainly the Second Circuit in *Casamento* and the district

15   court in *Gallo* both discuss the fact that generally does not

16   happen in practice and that --

17              THE COURT:  But I have the government, the party

18   that is going to be responsible for trying to meet its burden

19   of proof telling me that, in fact, yes, this is part and parcel

20   of our evidence, why should I be persuaded by your argument

21   that, no, that is not going to be the case?

22              MR. DURLAND:  Well, you should be persuaded by my

23   argument, your Honor, because much of that evidence is going to

24   be inadmissible.  I'm not talking about the government not

25   choosing not to present that evidence.  I am talking about,

1     just as in *Nessaro*, the inflammatory details of the homicides

2     and the extensive evidence of Mr. Jenkins movements prior to

3     the murders.

4                THE COURT:  But this is all part of the alleged

5     conspiracy.  In other words, the allegations and they are

6     allegations, that is all they are here, but the allegations are

7     that the Kingsmen Motorcycle Club were protecting its own and

8     protecting people jumping patch and because of that and part

9     and parcel they engaged in all sorts of violence and ultimately

10    murder.

11               MR. DURLAND:  That is certainly what the

12    allegations are and that is true for all of the defendants.

13    What we need to do here is understand the practical limitations

14    of this courtroom and the practical limitations --

15               THE COURT:  Don't worry about the practical

16    limitations of the courtroom.  We'll make adjustments to the

17    courtroom to accommodate as many defendants we need to in

18    trial.

19               MR. DURLAND:  And I was going to say, in addition

20    the practical limitations to the juror every time you add and

21    additional defendant to the juror, the complexity of the

22    limiting instructions the Court has to give increases.  The

23    need that jurors need to retain as to what to disregard with

24    consider, just overt ct No. 1, Defendant Willson is accused of

25    striking victim A, several times you would have to say,

1     "jurors, that is admissible against Mr. Willson."

2                 THE COURT:  Why is it admissible against only Mr.

3     Willson -- let me finish.  It's part of the alleged conspiracy.

4                 MR. DURLAND:  What I was going to say, your Honor,

5     was it's admissible against Mr. Willson, not for propensity

6     purpose.  You would have to give the instruction because the

7     jurors would not be able to use that evidence that, oh, Mr.

8     Willson is a violent guy, the other substantive offenses with

9     which he is charged must necessarily have been committed.  You

10    have to give that instruction.  There is no allegation that Mr.

11    Scanlon had joined the KMC at this point in time, 2009.  You

12    would have to say disregard that evidence with regard to Mr.

13    Scanlon and anybody else that is not alleged to be part of the

14    club at that time.  And with everybody else, you have to say,

15    consider this one overt act of the many that are alleged, you

16    have to say you have to consider this to establish the

17    conspiracy and you can consider this to establish the

18    enterprise, but not for any other purpose.

19                THE COURT:  Taking your argument to its logical

20    conclusion, though, you would be separating out each defendant

21    to be tried separately.

22                MR. DURLAND:  No, that's not true, your Honor.

23    What I'm trying to say is I'm trying to illustrate the ways in

24    which adding defendants increases the practical burdens on a

25    juror and --

1                THE COURT:  The defendants are added, though.

2    Keep in mind, Mr. Scanlon's memo, I think, makes the argument

3    that somehow the government hasn't proven the need to try

4    everybody together.  I can't remember the exact language.  But

5    the presumption is they all or should be tried together.  There

6    has to be a reason not to try them together, such as

7    antagonistic defenses, such as *Bruton* issues.  But this

8    argument that I'm having trouble accepting the notion that

9    somehow trying eight defendants together versus five defendants

10   together is really going to significantly change the hurdles

11   and burdens that will be faced in trying this case.

12               MR. DURLAND:  Let me try to convince you that that

13   is not correct, your Honor.  What we've tried to describe in

14   our papers, and I'll try to make it clearer now is it's not

15   just this differential between violence, defendants who are

16   personally accused of violent conduct and are not, I do think

17   that is significant.  But what is also the case is the nature

18   of the allegations of the defendants that we would put in the

19   group B trial, so it's the four that your Honor is

20   contemplating of severing, Scanlon and Osborne, those are very

21   streamlined charges, the conspiracy, guns, drugs and with

22   respect to Scanlon and Osborne and according to the

23   Government's papers, Stacharczyck obstruction after the fact

24   that is it a limited scope which would make that second trial,

25   I think, quick, clean and far less complicated than the main

1    trial that your Honor is contemplating, which has that it is

2    not just that these other alleged acts are violent, they are,

3    but they are also extraordinarily complicated.

4                THE COURT:  So Mr. Scanlon has to objection to

5    being tried with Mr. Caruso?

6                MR. DURLAND:  That's correct.  In our reply, we

7    proposed that Mr. Scanlon be tried alongside Mr. Caruso.

8                THE COURT:  How is that not, especially with Mr.

9    Osborne, who is alleged to have been an accessory after the

10   fact to a murder allegedly committed by Mr. Jenkins, and how is

11   that not going to have a potential antagonistic defense?

12               MR. DURLAND:  We're not raising a defense against

13   antagonistic defenses.  I believe that they typically need to

14   be contrary, such that the jury, if they believed one

15   defendant, they would have to necessarily disbelieve the second

16   defendant.  I don't think the potential defense theories put

17   forth by Mr. Scanlon and Mr. Caruso are quite so diametrically

18   opposed that that would apply, but you're certainly right that

19   defendant Caruso is accused of violent conduct that is somewhat

20   different than Mr. Scanlon, Osborne and the others who are in

21   group B, but I think his presence in group B is really just a

22   function of the fact he can't be with Jenkins, or, excuse me,

23   with Pirk and Enix in group A.  So we simply have to accept the

24   fact that that is not a perfect severance, there will be some

25   spillover prejudice that group B suffer, and they have to

1    accept that as the price that society demands for efficient

2    trials.  What I'm hoping to convince the Court of is when your

3    Honor talks about there needs to be some reason that justifies

4    a severance, really what we're talking about is should we

5    forego the benefits of a single joint trial.  Once a severance

6    argument is being made, you've already lost some of the

7    benefits of a single joint trial.  And then when, as is true in

8    this case, the efficiency to be gained in the severance are the

9    same or at least very similar with a six/six split as opposed

10   to an eight/four split, then it makes perfect sense and is the

11   perfectly consistent with the purposes underlying the several

12   rules that apply to severance and joinder to move Mr. Scanlon

13   and Mr. Osborne to the group B trial.  In that case, you would

14   have a natural dividing line between the defendants, the tier

15   two defendants, the four that your Honor has mentioned and then

16   Mr. Scanlon and Mr. Osborne, and then the remaining six

17   defendants who are accused of a much broader array of conduct.

18   And, your Honor, this is very similar to what the district

19   court did in *Gambino*.  Thereto, there were 12 defendants, and

20   the Court decided, when I look at the purposes of severance and

21   joinder, a reasonably even split is best designed to serve

22   those purposes.  And the Court split 7/5, the five defendants

23   in the first trial were those who were accused of the most

24   violent conduct, and those who were in group B in the Gambino

25   trial for seven defendants who were mostly involved in the.

1          THE COURT:  One thing you haven't mentioned at all

2     is having to have witnesses and victims testify repeatedly.

3     And what I hear the government saying is that if Osborne

4     Scanlon are tried separately from Pirk, Enix, Jenkins, McIndoo

5     and others, that the same witnesses and the same alleged

6     victims are going to have to testify.  And that is not

7     necessarily the case with Caruso, Stacharczyck, Williams and

8     Woods.

9          MR. DURLAND:  Well, your Honor, I'm not sure which

10    victims would need to be testifying multiple times in that

11    scenario in which Scanlon and Osborne are in group B.  I

12    haven't heard the government describe who that might be.  And

13    in terms of more broadly the repetition of witnesses, I would

14    urge your Honor to question whether it's really true that

15    simply because someone is accused as an accessory after the

16    fact, say, in Mr. Osborne's case, that that means all of the

17    witnesses necessary to prove the government's allegations that

18    Mr. Jenkins is guilty of the homicides and that Mr. Pirk

19    ordered them, that all of those witnesses would also be

20    necessary.  I submit to your Honor that that simply is not the

21    case.  Much of that evidence would be excluded as cumulative or

22    be excluded under 403.  It's simply far more prejudicial.

23          THE COURT:  You say much of it would be excluded.

24    Whether or not something is excluded under 403 is ultimately a

25    discretionary of the Court, so it's a bit presumptuous to

1    assume that something is going to be excluded because it's

2    cumulative or unprejudicial, the Court has to balance concerns

3    expressed by 403.  I think it's far too premature to anticipate

4    what, if anything, will be excluded under 403 in this trial.

5            MR. DURLAND:  I disagree with that, your Honor.

6    And these were central considerations of the Gallo court and

7    Gambino court.

8            THE COURT:  But, again, they are discretionary of

9    the trial court.  Because another trial court made a

10   discretionary determination has absolutely no binding authority

11   on me.  Certainly I can look at it and it's persuasive, each

12   case is different, each alleged conspiracy is different, each

13   alleged defendant is different in how they fit into the

14   conspiracy.

15           MR. DURLAND:  It's certainly true that your Honor

16   is not bound by the evidentiary decisions in an entirely

17   different case, but the point I'm making is the fact that the

18   government is not entitled to introduce unlimited enterprise

19   evidence is a consideration that those courts took into account

20   when making a severance determination.  Neither of those courts

21   said, well, I don't have anyway to know in the future whether a

22   particular piece of evidence will be excluded or not,

23   therefore, I'm simply going to assume that all of this

24   evidence, because it's technically relevant under 401 to the

25   enterprise element, I'm going to assume all that evidence is

1    going to come in.  I don't think that that is an appropriate

2    presumption for the Court to make.

3             If the basis for the government's assertion is

4    that all of the murder evidence is going to come in for the two

5    defendants, and, therefore, we're simply going to be

6    replicating all of that evidence in the two separate trials and

7    that is a waste of resources, then I don't understand the

8    government's in a trial of wood Williams and Caruso because the

9    murder evidence is just as relevant under 401 to the enterprise

10   and conspiracy elements against those three defendants and yet

11   the government has agreed that the murder evidence would be

12   considerably less in those trials.  I submit to the Court that

13   it would be just as streamlined of a murder case if you added

14   Mr. Scanlon and Mr. Osborne to group B.  Granted, Mr. Osborne

15   is charged with being an accessory after the fact, but that

16   charge really relates more to what Mr. Osborne did and what he

17   knew.  The same is true of the general obstruction count

18   against Mr. Scanlon, which includes a reference to the

19   obstruction of the murder investigation and does not require

20   the coroner to testify about what happened.  I suspect that

21   there is going to be very little, if any, dispute that the two

22   -- the two decedents were, in fact, shot and killed.  That is

23   not going to be an issue in the group B trial.  And I stand on

24   my argument, your Honor, that because much of that evidence is

25   not going to be admissible against these two defendants, I

1    don't think it's accurate to say that this is just going to be

2    replicated trials.  And if that were really true, the

3    government would not have conceded that the murder evidence in

4    the four defendant group B trial would be considerably less.

5              THE COURT:  All right.  And just so I'm clear,

6    because I think, initially, Mr. Scanlon's proposal had been to

7    have Mr. Caruso part of the so-called group A, but in reply you

8    agreed that because of antagonistic defense issues with Pirk

9    and Enix, and potentially Jenkins, that he could be tried with

10   your group, group B?

11             MR. DURLAND:  That's correct, your Honor.  I think

12   it's a *Bruton* and confrontation clause issue, but certainly,

13   yes.  In reply we said, in light of the government's argument

14   about accepting defendant Caruso in group B, and in light of

15   the government's argument with respect to the certificate of

16   conviction which I know others are going to get into, we

17   modified our proposal, it was really something that we had

18   contemplated in a footnote in our main motion and we simply

19   carried that out in the reply.  So what we are proposing, your

20   Honor, is the four defendants that you have indicated should be

21   in a second trial along with Mr. Scanlon and Mr. Osborne.

22             THE COURT:  Okay.  Thank you.

23             MR. DURLAND:  Thank you, your Honor.

24             THE COURT:  Let me hear from Mr. Osborne's

25   attorney, because, come on up to the podium, Mr. Brautigam.

 1          DEFENDANT WILLSON:  Your Honor, are we allowed to

 2     go to the bathroom?

 3          THE COURT:  Yes, you are.  Mr. Olejniczak, too.

 4     Do you have an envelope.  You want it to go to me.  I can't

 5     take it directly.  Give it to your attorney and I'll ask your

 6     attorney to give it to me.

 7          Mr. Willson was the first one went out.

 8          THE COURT:  Mr. Brautigam.

 9          MR. BRAUTIGAM:  Yes.

10          THE COURT:  So one of the main questions I have

11     for you what Mr. Scanlon's counsel is proposing Mr. Osborne be

12     tried second and Mr. Osborne is obviously in custody and that

13     is one of my concerns is one of the reasons that I split up the

14     pretrial motions with Judge Roemer in the case so we could move

15     it along quicker than everyone was indicating these cases

16     typically move.  And what is Mr. Osborne's position with

17     potentially not trying this case for another year?

18          MR. BRAUTIGAM:  He has no objection if he were to

19     be severed.  His circumstances have changed significantly since

20     the time of his arrest and incarceration.  So, as a kind of

21     practical concerns have diminished at least somewhat in terms

22     of him being incarcerated in pretrial detention awaiting a

23     trial.

24          THE COURT:  And does Mr. Osborne agree that he

25     then should be tried in a second group with the four defendants

1     who I had referenced earlier?

2                 MR. BRAUTIGAM:  Yes, your Honor.

3                 THE COURT:  And he has no objection to being tried

4     with Mr. Caruso.

5                 MR. BRAUTIGAM:  No, your Honor.

6                 THE COURT:  Anything else you want to argue on

7     this point?

8                 MR. BRAUTIGAM:  Of course, Mr. Durland presented

9     an excellent argument.  In the murder trials that I have been a

10    part of, the nuts and bolts of the murder itself, the most time

11    consuming portion of the proof and I don't think that all of

12    those nuts and bolts would be relevant to the Court's

13    discretion, of course, even admissible against Mr. Osborne.  I

14    think that having the trial groups as we have been discussing

15    would significantly streamline the evidence, of course,

16    pursuant to the government's intentions and the Court's

17    rulings.

18                THE COURT:  Okay.  Thank you, Mr. Tripi.  You want

19    to respond?  It may be helpful to hear the government's

20    response to this before we hear from additional Defense

21    Counsel.

22                MR. MAHONEY:  Is it okay if I sit with my client

23    for a minute?

24                THE COURT:  Sure.

25                MR. TRIPI:  I'll clear the way so they can return.

1           THE COURT:  Okay.

2           MR. TRIPI:  Judge, I respectfully disagree with

3   opposing counsel's points.  At the outset, I would note I

4   didn't hear one thing that triggered their burden to show you

5   that a specific trial right would be substantially prejudiced

6   by a joint trial as the one that is being considered here at

7   the moment.  With respect to overt acts that don't directly

8   implicate a particular defendant as your Honor noted in your

9   comments, this is a conspiracy case, the Courts presumed those

10  to be properly joined.  These defendants were part of an

11  enterprise.  So, for example, awareness that another individual

12  in the enterprise were engaged in certain acts would be

13  evidence against those who didn't.  The government will have to

14  prove that a defendant knew that a conspiracy extended beyond

15  their individual role.  So, for example, the facts of -- Mr. --

16  excuse me -- Mr. Willson visiting multiple Kingsmen Clubhouses.

17          THE COURT:  Mr. Willson?

18          MR. TRIPI:  For example, Mr. Willson's overt acts

19  1 through 10, visiting different KMC clubhouses in

20  Pennsylvania, beating a woman, engaging in that activity and

21  then hiding her at her mother's house, there will be evidence

22  that other Kingsmen members knew of this conduct and it was not

23  reported to the police, so that type.

24          THE COURT:  I guess that, but what about

25  specifically this argument with respect to Mr. Scanlon and Mr.

1    Osborne, because let's face it, we can accommodate as many

2    defendants an as we need to within reason within this

3    courtroom, but clearly from a just a numerical standpoint

4    splitting a trial of 12 defendants into six and six or

5    somewhere along those lines seems as though it would be more

6    streamlined, why would that be not true?

7                MR. TRIPI:  On the face of it, I would agree.

8    When you look at this particular case and this conspiracy, that

9    is where that analysis starts fall apart.  Starting with Mr.

10   Mr. Scanlon, who were the three highest ranking Kingsmen

11   members at the time the murders at the time of this case.  The

12   indictment sets out the chain of command.  Well, the three

13   highest ranking for members when the murders were comitted were

14   Pirk Enix and Scanlon.  So that is that.  So what defense

15   counsels' arguments ignores that among the predicate acts of

16   racketeering are acts involving murder and also acts of

17   obstruction of justice, those are predicate racketeering

18   activities.  So the activities of Osborne in deleting video and

19   others underneath Scanlon are applicable to Scanlon.  In

20   addition to that, as I have argued before, the individuals who

21   were directly involved in the murder came to the Olean

22   clubhouse, with Mr. Scanlon's awareness that they were there,

23   with Mr. Osborne's awareness that they were there.  That was

24   the hub location from which the events of that week leading

25   into the murders launched from.

1            Then, Mr. Jenkins, as I argued previously, goes on

2   his mission as his undercover operative trying to infiltrate a

3   rival club, all the while reporting back to and being in

4   contact with Mr. Pirk, and also being in contact with the

5   individual who has a ranking Kingsmen, also subordinate to Mr.

6   Scanlon who is also turning around and having phone

7   conversations with Mr. Scanlon.

8            THE COURT:  Not a named defendant?

9            MR. TRIPI:  Not a named defendant, a trial

10  witness.  So there are streams of communication going directly

11  from Jenkins to Pirk telephonically and in-person meetings as

12  well as from Jenkins and the witness traveling with Jenkins to

13  the other Kingsmen, ranking Kingsmen members in Olean, who is

14  turning around and having extensive phone conversations with

15  Mr. Scanlon.  And as I argued before, after the murders occur,

16  Mr. Jenkins returns to the Olean clubhouse and during that, if

17  you do the math, during that portion in time when Mr. Jenkins

18  is getting lost on his motorcycle and being captured on videos

19  and trying to figure out to where to flee post execution of the

20  victims, he ends up back at Olean -- there is a corresponding

21  phone call between Mr. Pirk and Mr. Scanlon, at that precise

22  point in time where this individual, the clubhouse is already

23  locked down, yet Jenkins is allowed in.  And then his clothes

24  get burned with the assistance of uncharged subordinate to Mr.

25  Scanlon and subordinate to Mr. Osborne, Kingsmen from the Olean

1    chapter and then monies are acquired for Mr. Jenkins to get out

2    of town.  And there is assistance from that personnel at that

3    chapter there.  Now, Mr. Osborne is charged specifically with

4    accessory after the fact for deleting video.  There will be

5    testimony that Mr. Scanlon and Mr. Pirk, essentially, made

6    comments that precipitated the deletion of the video.

7              THE COURT:  Let me ask you a question.  From the

8    government's standpoint, is Mr. Scanlon and Mr. Osborne's

9    alleged conduct more related to Mr. Pirk's, Mr. Jenkins, Mr.

10   Enix's alleged conduct than Mr. Olejniczak and Mr. McIndoo?  Do

11   you understand my question?

12             MR. TRIPI:  I'm processing it.  I think so.  Yeah.

13   To answer your question shortly and directly, yes.

14             THE COURT:  If, in fact, I did what Mr. Scanlon

15   and Mr. Osborne want me to do and grouped them with the other

16   four defendants that were initially referenced, ballpark

17   figure, how much time are you anticipating that so-called group

18   B trial would be?

19             MR. TRIPI:  I believe that injects, Mr. Durland

20   was saying, well, I don't know, that injects all of the

21   testimony from the murders into that trial.  Because you have

22   people who were a person or persons who were traveling with Mr.

23   Jenkins, who were deleting or helping burn clothing, and then

24   the testimony about the deleting the video, all of that, that

25   is a big portion of the murder testimony in and of itself.  So

1     that injects all of that into the secondary trial.  Whereas, I

2     could probably cover the fact that that happened with one or

3     two witnesses who would necessarily be testifying anyway in the

4     second trial as opposed to relitigating all of that and

5     bringing all of those witnesses back for this Caruso led trial,

6     secondary trial.

7             THE COURT:  Okay.  Anything else, Mr. Tripi, in

8     response to the arguments from Mr. Scanlon and Mr. Osborne?

9             MR. TRIPI:  Just that Mr. Scanlon maintains

10    contact, it's not just the murder, he maintains telephonic

11    contact with Mr. Pirk through the time of grand jury testimony

12    and subsequent to seminal events that are occurring in the real

13    world, like recovery of the firearm, there are conversations

14    over the phone.  Despite the fact one is in New York and one is

15    in Florida.  Grand jury subpoenas being issued to Kingsmen.

16    There are extensive phone contacts, other things in the real

17    world, there are extensive communications over 20, 30, 40

18    minutes that are counterintuitive to, "hi, how you doing,

19    haven't seen you in a while."  So you will have, that is

20    extensive phone record analysis linking those two would be in

21    both trials.  Kind of nitty gritty sort of boring, methodical

22    testimony will be duplicated twice.

23            THE COURT:  Okay thank you.

24            MR. DURLAND:  Judge, may be heard?

25            THE COURT:  Sure.

1          MR. DURLAND:  Briefly, I want to reiterate a

2    couple of points here.  First, we're already going to sever.

3    So this idea about, well, they haven't met their burden to

4    justify a severance in the first place, I think your Honor's

5    question was spot on.  Why, when we're already severing, why

6    would we not not -- why would we deny the benefits.

7          THE COURT:  I think if I were to say to the

8    government, okay, we're splitting this six and six, and you got

9    to decide who are the two additional who are going to be tried

10   with the four that I mention, you correct me if I'm wrong, I

11   think you would be electing Mr. McIndoo and Mr. Olejniczak.

12         MR. TRIPI:  To go with the four.

13         THE COURT:  Caruso, Williams, Wood and

14   Stacharczyck.

15         MR. TRIPI:  I would think that is correct.

16         MR. DURLAND:  That very well may be true, but that

17   doesn't mean that that decision actually furthers the

18   legitimate purposes of severance and joinder.  Certainly it's

19   in the government's best view to stick the defendants with very

20   little evidence or very little violence against them.

21         THE COURT:  That is not what I hear the

22   government, saying though.  What I hear the government saying,

23   and I have to rely on what the government is saying to me are

24   going to be the witnesses with respect to the evidence that it

25   intends to prove and what I hear the government saying is our

1    proof is going to substantially overlap between Jenkins, Pirk,

2    Enix, Scanlon, Osborne and Osborne.

3                    MR. TRIPI:  Yeah.

4                    MR. DURLAND:  Your Honor, we also heard the

5    government saying --

6                    THE COURT:  I guess Mr. Willson.

7                    MR. DURLAND:  You've also heard the government

8    saying there would be duplicative evidence in both trials,

9    therefore, there should be no severance whatsoever.  The

10   government later said Caruso and Williams, I guess the evidence

11   would be less.  In response to your Honor's text order, well, I

12   guess the murder evidence against Mr. Wood would also be

13   sufficiently streamlined as well.  And my point is you can

14   always point the six degrees of separation game with any of the

15   defendants.

16                   THE COURT:  What about the fact that Mr. Scanlon,

17   according to the government, was the third highest ranking

18   member of the Kingsmen at the time of the alleged murders?

19                   MR. DURLAND:  I'm glad you pointed that out.  I

20   think that is a perfect example of a fact that has a

21   superficial connection between Mr. Scanlon and Pirk and Enix

22   but has absolutely nothing to do with the purposes of severance

23   and joinder, I completely fail to understand.

24                   THE COURT:  But it does when you are alleging that

25   you have a conspiracy that an intrinsic part of it was the

1    order of direction and the rank and file of each one of these

2    members, and, of course, the leaders are naturally joined

3    together.  I mean the government's allegations, I mean the

4    indictment clearly goes through the fact that the way the

5    Kingsmen organization was set up was so that directions came

6    from the top down.  So, if you take out the third-ranking

7    member from that trial proof, that seems as though it's a

8    pretty big gap.

9                MR. DURLAND:  Your Honor, you're not taking him

10   out of the trial proof.  It's not as if the jury of group A --

11               THE COURT:  If you're not taking him out of the

12   trial proof, how does it possibly make it more efficient to

13   separate them out?

14               MR. DURLAND:  Because, your Honor, there is a

15   difference between making no reference to Mr. Scanlon

16   whatsoever and needing to present significantly less evidence

17   against Mr. Scanlon in group A when Mr. Scanlon is not a

18   defendant in that case.  And I think the broader point here is

19   something like Mr. Scanlon's rank, that, your Honor makes the

20   comment that it's related to the conspiracy, but that is true

21   for all of the defendants.  No one is saying, at least

22   certainly Mr. Scanlon is not saying, that these defendants are

23   improperly joined.  Our argument here is about how the

24   defendants should be allocated, now that the decision has been

25   made to sever, how those defendants should be allocated in

1    order to serve the purposes of severance and joinder.  Consider

2    the Williams and Stacharczyck, both of whom the Court has

3    indicated that it is willing to sever and the government has

4    said, well, the murder evidence against those two defendants

5    will be considerably less.  Mr. Stacharczyck is alleged to

6    have, and Mr. Williams, are both alleged to be at the North

7    Tonawanda clubhouse at the scene of the alleged murders.  Mr.

8    Williams is alleged to have contact with an eye witness and Mr.

9    Stacharczyck, the papers describe all of this, Mr. Stacharczyck

10   is accused of obstructing the investigation afterwards with

11   respect to Mr. Williams himself and with respect to some of the

12   eye witness, and so the point that I'm trying to make is, yes,

13   you can draw superficial connections between the various

14   defendants, but the point is why is it that these groups

15   shouldn't be evenly balanced and that the murder proof in

16   particular, but certainly the other proof as well, the evidence

17   about all of these other violent episodes, everything that you

18   heard Mr. Tripi say about why that all this proof is going to

19   be in injected back in, it all has to do with the conspiracy

20   and the enterprise that is true with every single defendant and

21   Mr. Tripi has conceded that the proof against the other

22   defendants would be significantly less, a two to four-week

23   trial, it can't possibly be the case that the proof against Mr.

24   Osborne and Mr. Scanlon would be orders of magnitude greater

25   when the rationale that the government is offering for

1    admitting this evidence is the same enterprise and same

2    conspiracy that is charged against Mr. Scanlon, Mr. Osborne,

3    Caruso, Wood, Williams and Stacharczyck.  All of those

4    defendants, your Honor, naturally fit within the second group

5    and we submit they ought to be tried together.

6             THE COURT:  Thank you.

7             MR. DURLAND:  Thank you.

8             THE COURT:  Let's hear from another defendant.

9    Want to hear from Mr. Enix.

10            MR. GRABLE:  On behalf of Mr. Enix, Mr. Connors

11    and I would rely on our papers and submissions.

12            THE COURT:  Mr. Mahoney, anything you want to add?

13            MR. MAHONEY:  No, I do think that Mr. McIndoo

14    should be in the second group, Judge, but I don't need to

15    amplify that.  I said in my papers I may have something to add

16    at a later time based upon certain factual allegations.  I'm

17    not doing it now.

18            THE COURT:  Let me ask this.  I know Mr. Jenkins'

19    counsel has raised certain *Bruton* issues, I didn't see any of

20    those issues raised by any other defendant.  Is it fair to

21    state, at least at this time, no other defendant is aware of

22    any *Bruton* issues that would necessitate a severance?

23            MR. MAHONEY:  Not from me, your Honor.

24            THE COURT:  Any other defense attorney disagree

25    with that?  No?  Okay.

1              What about Mr. Stachowski?

2              MR. STACHOWSKI:  I was leading toward the second

3    group.  There is not one thing that testimony ties Mr.

4    Olejniczak to any of the meetings or anything that has to do

5    with the murders, so he is a natural one to be in the second

6    trial.  And I'll rest on my papers.

7              THE COURT:  Thank you.  Mr. Eoannou?

8              MR. EOANNOU:  On behalf of Mr. Willson, we'll rest

9    on our papers.  Thank you.

10             THE COURT:  Let me ask you, Mr. Tripi, why is it I

11   should not group Mr. McIndoo, Mr. Olejniczak or Mr. Willson

12   with that second group?  And by, just so we're clear, the

13   second group I'm referring to Mr. Wood, Mr. Caruso, Mr.

14   Williams and Mr. Stacharczyck.

15             MR. TRIPI:  Yes, Judge.  Because, as you can see

16   from the indictment, there are certain lead up events to these

17   murders that involve Mr. Pirk taking control of the club and

18   rivalry with the sort of old-fashioned of the Kingsmen.  Mr.

19   McIndoo and Mr. Willson are directly involved, as well as Mr.

20   Olejniczak, all three are directly involved in actually acts

21   related to that.  Mr. Willson and Mr. Olejniczak are

22   specifically linked to this robbery and assault in the

23   Springville clubhouse on June 7th, 2013, where they, along with

24   Defendant Thomas Koszuta and others, well armed, while using a

25   mag light, beat this individual and then covered it up by

1    burning clothing, burning bloody carpet, things like that.

2    That event then triggered even more violence, more back and

3    forth between sort of the old-fashioned in terms of threats

4    back and forth and the Pirk faction and that culminates in a

5    drive by style shots fired shooting on August 3rd, 2013,

6    McIndoo and Willson are directly involved in that.  So McIndoo

7    and Willson are also members of the Kingsmen Nomads, who, when

8    you're looking at the structure and the command chain for the

9    Kingsmen, the Nomads answer only to regional presidents as well

10   as the national president.  So, in terms of the top down chain

11   of command, all of this related to Mr. Pirk is taking control

12   of the club and maintaining, more importantly, the control of

13   the club.  So all three of them, in that regard, are aligned

14   with Mr. Pirk.  Whereas, when you look at Mr. Caruso, by the

15   time the murders arrive, he wasn't even a member of the

16   Kingsmen anymore.  And the other two, Stacharczyck and

17   Williams, at least were members of his same West Side Chapter,

18   which by the time the murders occurred, were closed.  So there

19   is logic to trying them together because there is a lot of drug

20   evidence and firearm evidence that overlaps there, whereas the

21   violence, at some point in time, Mr. Caruso becomes a target of

22   the violence.  And so the Nomads, as a group, are tasked with

23   meting that out.  The there is an event an uncharged overt act

24   where Mr. Olejniczak and Mr. Koszuta and the decedent Paul Maue

25   go to the West Side clubhouse looking for him and they shot and

1     kill his dog.  And Mr. Olejniczak is part of that.  So both

2     charged and uncharged overt facts align Mr. Olejniczak with the

3     Pirk faction in this build up towards the murders.

4                 MR. STACHOWSKI:  Judge, he knows darn well that

5     Mr. Olejniczak had nothing to do with the killing of that dog.

6     That he was there, his truck was there to pick up some

7     machines.

8                 MR. TRIPI:  That may well be his defense.

9                 THE COURT:  Wait, wait, wait, you can't talk over

10    each other.

11                MR. TRIPI:  That may be his defense.

12                THE COURT:  Let Mr. Stachowski finish.

13                MR. STACHOWSKI:  He knows that Mr. Olejniczak and

14    his own witness Koszuta told him Olejniczak had nothing to do

15    with Mr. Koszuta and he pled already and he also knows Mr.

16    Olejniczak had nothing to do with burning anything of carpets

17    or anything else out there.  He knows that and yet he is making

18    representations to the Court to put him into the broader

19    conspiracy when he has never said.  He is in leadership because

20    he is not he never said he is a Nomad because he never was.  He

21    was just a guy that happened to come along that day and had a

22    truck and they took him to both of these, he is the gopher, and

23    that is what Mr. Koszuta will testify on the stand.

24                MR. TRIPI:  I don't know how Mr. Stachowski is

25    getting that.  He has a crystal ball for what people may

1    testify to, but I guess his view of conspiracy differs from me

2    and Mr. Stachowski and I'll leave it at that, Judge.

3              THE COURT:  Let's hear from Mr. Pirk's attorneys

4    or attorney?

5              MR. EASTON:  I have something with the grouping of

6    these trials, I think I have something to say.

7              THE COURT:  I figured you did.

8              MR. EASTON:  In paragraph 11 of the response that

9    was filed this morning by Mr. Tripi.

10             THE COURT:  Let me find it.  Okay.

11             MR. EASTON:  He says severing David Pirk is not a

12   viable option.  And then the critical sentence follows:  The

13   main trial is his trial.  And it's underlined and the emphasis

14   is in the original.  In many respects, Mr. Pirk is a person

15   standing trial as a human being charged with murder and that is

16   a trial in itself.  And then there is a separate trial that Mr.

17   Pirk as the personification of the Kingsmen.  And that trial,

18   whether it is characterized as the main trial or not, Mr. Pirk

19   is going to be the center of gravity for that trial.  We

20   understand that.  And the other defendants may have issues with

21   being tried with Mr. Pirk.  We have no objection being tried by

22   ourselves, that would be our preference.  And the another issue

23   the Court may address at the end in terms of the severance,

24   we're pretty neutral.  Other than the fact that that trial as

25   the government concedes is going to be Mr. Pirk's trial, both

1    as an individual human being charged with murder and also as

2    the personification.  For better or worse, he is now an emblem

3    for the Kingsmen as an organization.

4              THE COURT:  Okay.  Why don't we talk about Mr.

5    Jenkins and the severance motion with respect to Mr. Jenkins?

6    Let me ask Mr. Tripi, I know there has been a lot of flurry of

7    filings after I issued my text order.  But one question that

8    wasn't answered is why didn't the government, back in July or

9    even early August, file a motion to expedite Mr. Jenkins'

10   appeal?  We had a telephone conference in early August, I think

11   it was, when Mr. Enix had filed an extension or request for an

12   extension of time to file objections to the R and R.  And Mr.

13   Easton was on the call, Mr. Enix's attorneys were on the call,

14   and government counsel was on the call.  And, at that time, I

15   thought you said to me you had talked to your appellate chief

16   and you were planning to file a motion to expedite and then

17   nothing was done.

18             MR. TRIPI:  I did, and absolutely, it's absolutely

19   true when I said it.  Judge, all I can say is that was the

20   expectation.  Mr. Karaszwekski is our appellate division chief.

21   He is tasked with all of the appeals in the office, monitoring

22   both as a supervisor as well as his own case load.  And he is

23   very -- he is very diligent, so I don't want to have this

24   construed the wrong way, but I just simply believe that filing

25   that motion to expedite at that time fell off his radar,

1    proverbial radar to a degree.  It certainly shouldn't be

2    construed, I'm the trial -- as an office's view point, we don't

3    want that expedited.

4           THE COURT:  You'd agree with me that waiting until

5    after I issue a text order and then filing a motion to expedite

6    the oral argument, it's not the appropriate way to approach

7    this if you want to move the appeal forward.

8           MR. TRIPI:  I believe two things might have been

9    at play.  One is, like I said, a bit of an oversight, but No.

10   2, and there is no getting around that.  I think it was a bit

11   of an oversight or miscalculation and then an oversight, but we

12   certainly want this expedited.  We're now on track doing our

13   best to get it expedited.

14          THE COURT:  You say you're on a track.  Mr.

15   Karaszweski's motion to the Second Circuit asks that the panel,

16   as soon as possible, after the filing of all briefing on

17   December 18th, that a panel, as soon as possible, after that,

18   hear the appeal.  According to my review of the Second Circuit

19   website, the first possible date that that could happen would

20   be January 3rd.  In other words, there is not another panel

21   meeting until January 3rd.  And so then the concept that you're

22   -- let's say the government's motion is granted by the Second

23   Circuit.  The concept that you're -- let's say that you have

24   oral argument on the January 3rd, I think it's overly

25   optimistic to think you're going to get a decision from the

1     Second Circuit.

2                MR. TRIPI:  Sometimes we've received summary

3     orders the next day.  And we think this particular appeal is

4     that type -- this is me speaking -- that we will prevail.

5     Essentially, the only thing that the defense can even argue is

6     you got the facts wrong and under a clearly erroneous standard,

7     and our review from top to bottom in our office, that standard

8     is not going to met.  And we think at least there is a descent

9     plausible chance, if we can get to the first argument date, the

10    Circuit will accommodate and render the decision in time for

11    the trial.  And so the gist of maybe my reasoning is flawed,

12    but the gist of my motion and my response to you was, I guess,

13    what is the harm in waiting until that becomes clear because

14    you scheduled this trial well before anyone had any other

15    trials scheduled, and so for other people who were getting

16    trials scheduled in the meantime, they were go doing so with

17    full knowledge that you had a date certain.  I've tried other

18    cases in the meantime, Mr. Cullinane has tried other cases in

19    the meantime, and has one in November with Ms. Meyers Buth,

20    that happens.  That is what we do as trial lawyers.  Maybe

21    there is egg on our face for not getting the motion filed in

22    July when I anticipated it would.  At the same time, as I

23    pointed out, Mr. Jenkins knew full well, the day he was

24    indicted federally, that he was convicted state side.  So they

25    waited nine months to file this and finalize the motion and

1    they send to it to you, red flag that a first year law student

2    could have known was abrogated and I had private conversations

3    explaining my personal circumstances and why I could not have

4    been directing the Niagara County DA's office to prosecute a

5    murder first in their backyard, I wasn't around for most of it.

6    So I don't understand, I don't understand why they continued on

7    that course --

8                THE COURT:  Let's keep your voice an octave lower.

9                MR. TRIPI:  I apologize.  I'm just advocating, I

10   don't mean --

11               THE COURT:  I know you are, but I can hear you

12   fine.

13               MR. TRIPI:  I'm sorry.  And so I laid it all out

14   with the expectation, maybe, erroneously, that even the

15   supplement wouldn't be pursued.  I was surprised when I saw the

16   supplemental motion come out to you.  But then I was even more

17   surprised to see the cherry picking that happened from the

18   state record, and the case law that there was a two-year sliver

19   of time that *Blockburger* wasn't the only law of the land and

20   those are the cases they cited.  So I don't think that is fair.

21               THE COURT:  Let me ask you a couple of questions,

22   and I want to hear from Mr. Jenkins' attorneys.  One of the

23   questions is my understanding of Second Circuit case law is

24   that even if there was a double jeopardy issue with respect to

25   some of the counts that are charged against Mr. Jenkins, he

 1    would not have an interlocutory appeal from my denial of his

 2    motion to dismiss because it would not resolve the entire case

 3    against him.  But I haven't seen the government take that

 4    position.  I see Mr. Karaszweski in his motion to the Second

 5    Circuit saying, Second Circuit, you have jurisdiction over this

 6    appeal.  I'm not sure that is correct.  And so if you're not in

 7    a position to respond to that right now, that is fine.

 8              MR. TRIPI:  Can I further respond?  Honestly, I

 9    need to consult, I'm not -- I don't have that.

10              THE COURT:  Let me ask you a second question

11    because there is case law that neither party has cited, I know

12    Mr. Okay, I think, in his papers, raised the issue because of

13    the Hells Angels' case in front of Judge Siragusa as to whether

14    or not I still have jurisdiction because, in that case, the

15    lead defendant raised a similar argument about double jeopardy,

16    Judge Siragusa took the position in that case that that

17    divested him of jurisdiction once that lead defendant filed an

18    appeal to the Second Circuit.  I don't know that that is

19    correct because my reading of the case law is that, in fact, if

20    I were to determine that Mr. Jenkins' appeal is frivolous, that

21    I don't think there is any likelihood of success, and that

22    under no reasonable view of the circumstances would he be

23    successful with it, there is case law, and I'll give you the

24    cite saying I still have jurisdiction, not only do I have

25    jurisdiction, I have every right to continue to schedule Mr.

1    Jenkins for trial and proceed with the trial even if there is

2    an appeal pending before the Second Circuit.

3              MR. TRIPI:  I think that was briefly discussed in

4    my office and perhaps, perhaps, the appellate division chief

5    didn't have all of the facts of my case at his fingertips in

6    terms of every charge when it would have been appropriate.

7              THE COURT:  Because, in my view, if, in fact, the

8    Second Circuit doesn't have jurisdiction of Mr. Jenkins'

9    appeal, then there is a very strong argument that the appeal,

10   at this point in time, is frivolous.

11             MR. TRIPI:  Judge, can I get the cites?

12             THE COURT:  You're not ready to respond to me?

13             MR. TRIPI:  Can I get 48 hours to get you

14   something in writing on those specific questions?

15             THE COURT:  Let me hear from Mr. Jenkins'

16   attorneys at this point, Mr. Deal.

17             MR. DEAL:  I think you meant to say if the appeal

18   was deemed to be frivolous then the Second Circuit wouldn't

19   have jurisdiction.

20             THE COURT:  Say that again.

21             MR. DEAL:  I think you meant to say if the appeal

22   is frivolous, then the Second Circuit wouldn't have

23   jurisdiction.

24             THE COURT:  Did I say it in the reverse?  Let me

25   make it clear what I'm saying.  In other words, I've seen case

1   law that says if there is a frivolous appeal from the denial of

2   a motion to dismiss on double jeopardy grounds, that the trial

3   court can still go forward with the trial, still even commence

4   jury selection and try the case while the appeal is pending.

5   Now, those cases, at least what I've seen at this point, all

6   seem to be cases where the motion to dismiss on double jeopardy

7   grounds was based on a declared mistrial, which, obviously, we

8   don't have here.  In other words, double jeopardy did attach to

9   the state court conviction, so this is a different case.

10  However, if, in fact, the Second Circuit does not have

11  jurisdiction over the interlocutory appeal at this stage of the

12  litigation because it would not resolve all of the counts that

13  are contained in the indictment, then is there an argument, I'm

14  raising the question, I'm not saying that I have decided it,

15  but I'm raising the question, is there an argument that I still

16  have jurisdiction and still would have every right actually to

17  proceed with the trial with Mr. Jenkins even if the Second

18  Circuit is still considering this appeal?

19              MR. DEAL:  Well, Judge, we would be more than

20  happy to brief that.  If you're directing us to brief it, we

21  will.  If you're actually directing the government to raise the

22  issue, we'll wait for it to be raised.  But either way, he can

23  present an argument.

24              THE COURT:  Here is where I'm coming at this from.

25  I don't think it's reasonable if, in fact, the double jeopardy

1    appeal has merit to it and there is the possibility that the

2    Second Circuit is going to resolve it at some point, in other

3    words, not decline to exercise jurisdiction, I don't think it's

4    particularly reasonable to require Mr. Jenkins' attorneys to

5    prepare for trial, even though, I appreciate the government's

6    arguments that they waited, in the government's view, too long,

7    I don't think it's particularly reasonable to have Mr. Jenkins'

8    counsel preparing for trial and what we're waiting, January

9    15th, 13th, as the Second Circuit decided or not and you wait

10   until the day from before the trial starts and cut Mr. Jenkins

11   loose, so to speak, I don't think that is a proper way to

12   manage the case.  On the other hand, if I'm going to try Mr.

13   Jenkins in any event because I determine I have jurisdiction,

14   that is a different scenario.  I think I need to make a

15   decision in that regard before making a determination about the

16   severance.  Let me be clear about something, I don't think it's

17   appropriate or fair for all of these defendants to go to trial

18   with Mr. Jenkins and have his certificate of conviction

19   admitted.  I realize there is circuit case law that allows for

20   it.  I think that would be unfairly prejudicial and I would not

21   allow that to happen.

22              MR. TRIPI:  We conceded as much in our papers.  If

23   you were of that view, then we won't go forward with it.  If he

24   is in a joint trial maybe different, if he is severed or

25   whatever in a joint trial, fine.  No problem.

1          THE COURT:  And so the second issue is I'm not

2     particularly persuaded by the Bruton issues that Mr. Jenkins is

3     making, especially if we're severing out Mr. Caruso and Mr.

4     Williams, I think the other issues can be cured in one way or

5     the other --

6          MR. DEAL:  Right.

7          THE COURT:  -- with a joint trial.  So really what

8     the critical decision I have to make is what how do I go about

9     this appeal, which, at this point, may not be resolved at the

10    time we start this trial.

11         MR. DEAL:  Well, again, I repeat to the Court, if

12    you want to direct the issue to be briefed, we'll brief it.  If

13    you're directing the government to raise it by motion, we'll

14    wait for that and address it then, either way, obviously, this

15    is an important issue for the Court and we can address it.

16         THE COURT:  Let's face it, if I sever out Mr.

17    Jenkins and try, I guess, it would be seven defendants, let's

18    say, hypothetically, say seven defendants, four defendants and

19    Mr. Jenkins' trial, I'll assume that Mr. Jenkins trial will be

20    a significant length of time.

21         MR. TRIPI:   Yes, Judge.

22         THE COURT:  And involve pretty much all of the

23    same witnesses that you would have, at least in one of the

24    trials, right?

25         MR. TRIPI:  That would be correct.

1          THE COURT:  So I do think I need further briefing

2     on this before I can resolve Mr. Jenkins' issues.  Let me give

3     you the cites of the cases.  I don't have the cite for the

4     Second Circuit case law that stands for the proposition there

5     is no jurisdiction by the circuit if in fact the appeal from

6     the denial of double jeopardy is not going to resolve all of

7     the counts.  I'll be very up front, when I wrote the decision

8     on the double jeopardy, I wrote it anticipating Mr. Jenkins was

9     going to file an appeal, and I wrote it and I know I cited the

10     notion in there that if this isn't going to resolve everything,

11     it doesn't give the circuit court jurisdiction.  I believe

12     there is a cite in the decision, but you can all find it easy

13     enough I'm sure.

14          MR. DEAL:  Sure.  We'll go back and look at that

15     decision for that specific purpose.

16          THE COURT:  The case law for the proposition that

17     a district court may retain jurisdiction and proceed to trial

18     despite the pendency of a defendant's interlocutory double

19     jeopardy appeal, when the appeal is frivolous, and that is the

20     standard, the case is *United States vs. Millan*, 4 F. 3d 1038,

21     Second Circuit case from 1993.  There is some district court

22     cases in our circuit that have adopted or proceeded along these

23     lines:  *United States vs. Serrano*, 2017 Westlaw 590321,

24     Southern district of New York from February 14th, 2017.  And

25     *United States vs. Torres*, 1995 Westlaw 404825, Southern

1    District of New York from July 6th, 1995.  And it's based on,

2    it all seems to be based on a Supreme Court case from 1977

3    which is *Abney vs. United States*, 431 U.S. 651, 1977, where the

4    Supreme Court said, "the very nature of a double jeopardy claim

5    is such that it is collateral to and separable from the

6    principle issue at the accused' impending criminal trial."  And

7    the Supreme Court specifically warned against allowing

8    defendants to use frivolous double jeopardy motions to proceed

9    as a method to bring more serious but otherwise none appealable

10   questions to the attention of the courts of appeals prior to

11   conviction and sentence.

12            MR. DEAL:  I just want to make sure that I -- we

13   address exactly what you want us to address.  Because your

14   decision relative to the motion didn't declare there -- it was

15   a frivolous motion.  So now you want us to address whether or

16   not in fact the motion was frivolous?

17            THE COURT:  No.  And I didn't declare that it was

18   frivolous.  I don't personally think there is merit to the

19   appeal, but that doesn't mean the same thing as saying that

20   it's frivolous.  However, if, in fact, the Second Circuit

21   doesn't have jurisdiction over the appeal, then I think the

22   appeal is frivolous.  In other words, if the Second Circuit

23   doesn't have the jurisdiction over this appeal because it's not

24   going to resolve, for instance, you have a premises count, Mr.

25   Jenkins is accused of maintaining a premises at the South

1    Buffalo Kingsmen chapter for use as a drug house.  I don't know

2    how you could possibly argue that his state court convictions

3    could constitute a double jeopardy bar for that count.  And so

4    if the Second Circuit concludes that, in fact, a resolution of

5    the double jeopardy motion, even if they disagree with me, even

6    if they say the state court convictions preclude prosecution of

7    Mr. Jenkins on some of the counts, my understanding of the law

8    is that does not give the Second Circuit jurisdiction at this

9    stage of the litigation.  It's preserved until the end of the

10   trial, but because it does not eliminate the need to try Mr.

11   Jenkins, the Second Circuit doesn't have jurisdiction.

12            MR. DEAL:  And I'm glad I asked the question.  I

13   think what I was confusing was whether the appeal is deemed

14   frivolous or whether the motion was deemed frivolous or not can

15   be something that is decided independent of whether or not

16   there are other charges that Mr. Jenkins can be brought to

17   trial on so that to me, that is an independent analysis.  Does

18   the double jeopardy, do the counts that are subject to the

19   double jeopardy motion, do they separate Mr. Jenkins completely

20   from this case if the motion was ultimately ruled in his favor

21   or are there other issues, other charges, other counts that

22   could be brought against him regardless of whether or not there

23   is a double jeopardy claim, I don't think that renders it

24   frivolous.  I think that renders the Second Circuit not having

25   jurisdiction sufficient to postpone the trial.

1          THE COURT:  Okay.  You can make that argument.  I

2    guess it's probably better if I get briefing from the

3    government first on this position.  No. 1, do you view the

4    appeal as frivolous.  No. 1, do you view the appeal as

5    frivolous because the Second Circuit doesn't have jurisdiction

6    or does the Second Circuit have jurisdiction because of the

7    underlying merits of the motion then I'll get a response from

8    Mr. Jenkins on it.  Okay?

9          MR. TRIPI:  Yes, Judge.  How long would you like,

10   we'll do it as quickly?

11         THE COURT:  I want to make a decision on,

12   obviously you want me to make a decision on Mr. Jenkins.  I

13   would like to set a further oral argument date on this point

14   with respect to Mr. Jenkins.

15         MR. TRIPI:  We could do it Monday or Friday.

16         THE COURT:  Obviously you've heard the government

17   indicate that if he goes to trial in a joint trial, they're

18   going to forego, even though I guess I wouldn't allow, but

19   they're going to forego trying to pursue the trying to admit

20   the convictions in state court, but notwithstanding the fact

21   that he if he is tried by himself the, I think, the reasonable

22   likelihood, is that, particularly once the state appeal is

23   exhausted, that that would be admissible at a Federal Court

24   trial against Mr. Jenkins, that nonetheless, he would elect to

25   defer or to not be tried jointly with the rest of the

1    defendants.

2             MR. DEAL:  I think, at this point, obviously, we

3    would make arguments relative to that very issue if he were

4    tried by himself.  And I understand and I appreciate the

5    government's concession if he was tried with other

6    co-defendants, but I certainly wouldn't concede that it's

7    necessarily admissible if he was tried by himself having said

8    that.

9             THE COURT:  Having said that, though, standing

10   right here now, you know if he is tried jointly with everybody

11   else, it's not coming in.  And if he is tried by himself, there

12   is at least a chance that it may come in?

13            MR. DEAL:  We understand, yes.

14            THE COURT:  Okay.  How is everybody's availability

15   on November 8th, which is a Wednesday.

16            MR. DEAL:  I'm available.

17            THE COURT:  Mr. Tripi?

18            MR. TRIPI:  Yes.

19            THE COURT:  Let's set it down for oral argument,

20   this issue as to -- I'm going to make a decision with respect

21   to everybody else today.  It's Mr. Jenkins that we're going to

22   hold in abeyance.

23            MR. DEAL:  You have a trial that day.

24            THE COURT:  I do.

25            MR. DEAL:  I have a client testifying.  I'll be

1    available whenever you are.

2                    THE COURT:  We'll say 4 o'clock.

3                    MR. DEAL:  Sure.

4                    THE COURT:  We'll set it down for the argument

5    with respect to Mr. Jenkins' severance motion 4 o'clock on

6    Wednesday November 8th.  If the government can submit any

7    briefing on this issue by Monday, October 30th, that works, Mr.

8    Tripi?

9                    MR. TRIPI:  Yes, judge, is does.

10                   THE COURT:  And Mr. Deal, could you get me

11   anything by when you tell me, could you do the end of the week

12   or do you know?

13                   MR. DEAL:  The 6th.

14                   THE COURT:  I'll give you to November 6th.

15                   MR. DEAL:  Is that enough time for the Court?

16                   THE COURT:  That will be enough time, that's fine.

17   So, Mr. Jenkins, you have your hand up.

18                   DEFENDANT JENKINS:  Yeah.  Can I ask you a

19   question?

20                   THE COURT:  Talk to your attorney.

21                   DEFENDANT JENKINS:  This is just about the date

22   thing, this isn't nothing legal.  You said that November 8th?

23                   THE COURT:  Everything is legal when you're in a

24   courtroom.

25                   DEFENDANT JENKINS:  I didn't mean that.  Oral

1     argument at 4 o'clock, can I not be there?

2                    THE COURT:  You want to waive your appearance?

3                    DEFENDANT JENKINS:  To that one specifically.

4     Because if I come here and I'm in this courtroom at 4 o'clock,

5     I will not be able to go back to Attica prison.

6                    THE COURT:  What about noon, would that work

7     better for you?

8                    MR. DEAL:  Yes.

9                    MR. TRIPI:  That's fine.

10                    THE COURT:  I have a sentencing at 1 o'clock.

11    I'll be here on trial.  We'll do noon.

12                    DEFENDANT JENKINS:  That was the only thing.

13                    THE COURT:  It's better that you're here.  It's an

14    issue, it's a significant one for your purposes for this case.

15                    All right.  Mr. Deal, anything else that you

16    wanted to address today with respect to Mr. Jenkins.  I know

17    you have the venue location issue, which I'll hear from Mr.

18    Pirk on or Mr. Easton on that.

19                    MR. DEAL:  Sure.  You already referenced the

20    Bruton issue I'll rest on the papers and I understand what

21    you're saying and why.  In terms of the change of venue issues,

22    I'll defer to Mr. Easton.  And I'll accept that Mr. Tripi's

23    response that he filed this morning applies to ours, also.

24                    MR. TRIPI:  Thank you.

25                    THE COURT:  I know that you've now, though, on

1    behalf of Mr. Jenkins --

2                    MR. DEAL:  Just so you know, I filed that before I

3    read Mr. Tripi's response.

4                    THE COURT:  You're no longer seeking an order

5    under local rule 23(c).

6                    MR. DEAL:  I'll take Mr. Tripi's word that that is

7    how the statement came about.  It came about in a detention

8    hearing and he wasn't orchestrating.

9                    THE COURT:  You're withdrawing that aspect of your

10   motion then?

11                   MR. DEAL:  Yes.

12                   THE COURT:  Mr. Easton, do you want to argue about

13   the location of the trial?

14                   MR. EASTON:  Briefly, your Honor.  The papers have

15   been accumulating with the Court since the original omnibus

16   motion.  The supplement was just to, first of all, make

17   reference to this is yet another Kingsmen indictment.

18                   THE COURT:  I know, it got assigned to me.  I'm

19   aware of it.

20                   MR. EASTON:  And I wanted the record to be clear

21   on that that there is a third trial down the road perhaps

22   involving the Kingsmen.  The gravamen of the supplement, it was

23   not, we were not asking for a gag order, although I think our

24   supplement made clear we didn't know from the article itself it

25   said these comments were made by the Assistant U.S. Attorney.

1    In paragraph 19, we said we don't know if they were outside of

2    the court or not, but, in any event, given the timing here that

3    this trial is scheduled, for a statement to get publically

4    disseminated in Buffalo and the Kingsmen and the conduct here

5    allegedly "represents organized crime at its best" and have

6    that be the front page newspaper article, and our clients in

7    the front page, and, especially, in light of the Court's ruling

8    today or the Court's ruling and the concession today that the

9    conviction of Jenkins is not going to be admissible at Pirk's

10   trial, to have that come out is uniquely prejudicial to Mr.

11   Pirk.  It's not just garden-variety pretrial publicity.  This

12   is unique in that he is charged with murder.  In the state

13   side, Jenkins is charged with murder.  Pirk is never charged

14   with murder.  And now, to use that as a building block in a

15   federal murder trial, and say, well, he is guilty of ordering

16   Jenkins, and if the jury is in anyway using that to buttress

17   the government's case, it's completely -- it's completely

18   unfair to Mr. Pirk.  And the remedy that we suggest is so mild,

19   to simply transfer it to Rochester.  We're in the same

20   district.  We're not asking like in the *Silver* case to dismiss

21   the indictment or even interdistrict, we're saying shift the

22   location and --

23            THE COURT:  Let's be clear, you know, I'd like

24   nothing better than personally to try this case in Rochester.

25            MR. EASTON:  I have a vested interest it as well,

1    I know the other defendants don't.

2              THE COURT:  Is there any other defendant, we've

3    got defense counsel here, any other defendant other than Mr.

4    Jenkins who wants to transfer the venue any other defendant who

5    agrees with Mr. Easton that this case should be tried in

6    Rochester?

7              DEFENDANT CARUSO:  Well, sure.

8              THE COURT:  You're already severed, so we very

9    well may be trying your case in Rochester, Mr. Caruso.  Any

10   other defendant, other than, I guess Mr. Caruso, any other

11   defense attorney that agrees with that.  Nobody else wants to

12   do it.  And you look at the government's argument is the

13   witnesses, the I mean, just even from a practical standpoint

14   with all of the CJA counsel involved in this case.  And you're

15   not citing to -- you're citing to some Buffalo newspaper

16   articles, you're citing to a state court trial that took place

17   in 2014.  You're citing to Buffalo News articles, eight

18   counties, we're going to draw our prospective jurors from and

19   I'm not quarrelling with the notion it's going to take some

20   time to pick a jury and we're going to find prospective jurors

21   that read about the case and are not able to serve because of

22   that, but these are not insurmountable challenges.

23             MR. EASTON:  I understand that, your Honor.  And

24   one of the purposes of the supplement was, also, to address the

25   estimates of the trial being conducted in that time period,

1    especially if it's eight and four, may be optimistic on the

2    government's part.  And I think part of that is jury selection

3    is going to be, I think, difficult in light of these articles,

4    in light of this type of publicity and it may involve

5    individualized voir dire and use of questionnaires and it may

6    elongate the time and the time periods.

7         THE COURT:  I pick jurors on a regular basis and

8    I'm shocked at what they don't know.  And I'm shocked at what

9    newspapers they don't read.  They get their news, if you want

10   to call it news, on social media and other than that, they're

11   not really invested in reading the newspaper like maybe 20

12   years ago or even 10 years ago people would have been.

13        MR. EASTON:  It's hard to argue with, your Honor.

14   I think this case also there is a social media component of

15   this case that I think this type of news article in this

16   critical period before trial, I think, I think, creates issues

17   of due process and fairness.  And I laid them out in the

18   papers.  But, also, I think it will elongate the time, duration

19   and the difficulty in picking a jury.  And, you know, I think

20   there was a little bit of heat shed in these papers, not so

21   much light, but one thing that we make pains in our supplement

22   to emphasize was, we don't what happened.  Well, Mr. Tripi says

23   he did not make those statements to the press and I certainly

24   take him at his word.

25        THE COURT:  You don't have to take him at his

1    word, get the transcript.

2             MR. EASTON:  But it doesn't really matter.  And,

3    also, Mr. Hochul did issue a press release where he said the

4    Kingsmen is a criminal front.  And in the light of that type of

5    extrajudicial comment, I think the government should be aware,

6    if the media is present, they should temper their comments.

7             THE COURT:  Mr. Tripi didn't win the detention

8    hearing.  Judge Roemer released the defendant that you're

9    arguing should be detained.

10            MR. TRIPI:  It's a contentious detention hearing.

11            THE COURT:  You're going to be advocates in court

12   and it's fine to be advocates in court.  I agree with you, if

13   somebody is outside of court and making comments to the

14   newspaper or the media about the case and puffing up the

15   sensationalism of the case, I agree with, that is a problem.

16   Other than the, you cite to Mr. Hochul, and you cite to the

17   initial return of the indictment, that was back in, what, 2016,

18   there is nothing that the prosecutors in this case have done,

19   as far as I'm aware, in terms of trying to drum up media

20   attention about the case.  And other than the return of the

21   indictment recently, I don't think there has been anything, the

22   other indictment, recently, I don't think there has been

23   anything cited to me about this being constantly in the press

24   here or in the news media.

25            MR. TRIPI:  I believe that is accurate.  There was

1    an initial, when the indictment was returned, and now

2    corresponding with the new indictment, there was an article.  I

3    don't recall anything else in between those two points in time.

4              MR. EASTON:  Other than the press release with Mr.

5    Hochul.

6              MR. TRIPI:  That was commensurate with the return.

7              MR. EASTON:  No, August of 2016 on an appeal of

8    the a co-defendant.

9              MR. TRIPI:  Okay.

10             THE COURT:  Anything else, Mr. Easton?

11             MR. EASTON:  No, your Honor.

12             THE COURT:  Mr. Tripi?

13             MR. TRIPI:  Judge, I'll rest on my papers.

14             THE COURT:  Let's do this.  Let's take a 15-minute

15   break and let's resume back here at shortly before 2 and I'll

16   let you know what I'm doing at least with respect to the

17   defendants other than Mr. Jenkins?

18             MR. MAHONEY:  Judge, can I interrupt?  I did

19   mention early that I may be making an application to the Court

20   specifically related to Mr. McIndoo and relates to this.  I'll

21   file something, and I can file something by Thursday afternoon,

22   I don't know if that would effect your thinking on.

23             THE COURT:  Explain to me what you mean.  I'm not

24   totally following you.

25             MR. MAHONEY:  There is something that has come up

1    that relates to Mr. McIndoo's right to present his defense with

2    respect to calling witnesses that may affect the order in which

3    individual defendants would have to be tried, so, and part of

4    that would be submitted under seal and part of it would be a

5    motion that we file, but behind that would be a motion under

6    seal and --

7              THE COURT:  This is separate and apart from what

8    you communicated with my Chambers yesterday about CJA counsel?

9              MR. MAHONEY:  Yes, totally different.

10             THE COURT:  And the reason that you haven't

11   brought it up before today?

12             MR. MAHONEY:  Just something I just learned in

13   talking to another attorney in the case.

14             THE COURT:  All right.  Well, I mean, I think

15   everybody wants me to make a decision today and that was my

16   intention.  And I feel I have enough information.  Is there

17   something you can share with me right now that you think is

18   going to influencing the decision I'm about to make?

19             MR. MAHONEY:  It's something that I have to gather

20   more information on it, Judge, and I should have that

21   information by Thursday.

22             Because it's an application which the core of it

23   would be filed under seal, it's something I wouldn't be free to

24   speak on right now.  What I would say now, it is somewhat

25   speculative, so I'd rather wait.  I feel I would be able to

1    speak to it and address it more specifically by Thursday.

2              THE COURT:  And the way that you think this is

3    going to impact Mr. McIndoo is -- can you tell me in what

4    regard?

5              MR. MAHONEY:  That would require him to be tried

6    separate will from Mr. Willson.

7              THE COURT:  From Mr. Willson?

8              MR. MAHONEY:  Yes.

9              THE COURT:  Okay.  I'm going to make a decision

10   right now.  And if, in fact, the decision, you subsequently

11   learn information that you feel impacts the decision that I

12   make, you can always file a motion at that point, even if it's

13   this week, and we'll hear further argument on it at that point.

14             MR. MAHONEY:  All right.

15             THE COURT:  Okay.

16             MR. MAHONEY:  Yes, ma'am.

17             THE COURT:  All right.  Let's be back here at 2

18   o'clock, everybody.  Thank you.

19             (Whereupon, there was a break in the proceeding.)

20             THE COURT:  For the record, we're back on the

21   record.  Note the presence of counsel and the defendants.  So

22   Mr. Deal?

23             MR. DEAL:  Thank you, Judge.  Mr. Jenkins is

24   concerned about the timing of this afternoon.  I was wondering

25   if he could be relieved or his presence could be excused so he

1      can get back to make head count for Attica?

2                  THE COURT:  Sure, we got five more minutes.  I'm

3      not going to make any decisions with respect to Mr. Jenkins.

4      At this point, if you want to be excused, you are free to

5      leave.

6                  DEFENDANT JENKINS:  I'll stay if there is a few

7      minutes left, that's fine.

8                  THE COURT:  I'm ready to announce my decision.  I

9      want to be reiterate that my plan is to issue a written

10     Decision and Order memorializing all of the reasons I'm

11     reaching the decision that I am.  I think that with all of the

12     papers that were submitted, probably the most appropriate

13     comment was on behalf of Mr. Scanlon's attorneys where they

14     said no severance is perfect, and I think that is clear.  But

15     based on my consideration of all of the various factors, I'm

16     going to sever Mr. Caruso, Mr. Williams, Mr. Wood, Mr.

17     Stacharczyck.  So the main trial will be Mr. Pirk, Mr. Enix,

18     Mr. Willson, Mr. Osborne, Mr. Olejniczak, Mr. Scanlon, Mr.

19     McIndoo, and I'm reserving on an issue with respect to Mr.

20     Jenkins right now.  In terms of the location of the trial, it's

21     going to be here in Buffalo.  In other words, the main trial

22     will be here in Buffalo.  I've been in all of your shoes before

23     in terms of being a private practitioner and you prepare a lot

24     of motion papers and then you argue before the judge and you

25     think your arguments didn't have any impact on my ultimate

1    decision.  I want to assure you that that is not the case.  I

2    have carefully considered all of your papers.  I thought all of

3    the papers were excellent.  All of the arguments were

4    excellent.  And I did give further consideration.  No question,

5    this is kind of the direction I was going before the oral

6    argument, but I thought long and hard about it even beforehand

7    and even after the oral argument.  And I think certainly

8    reasonable minds may disagree with this outcome, but this is

9    what I think is the best resolution based on my consideration

10   of all of the factors.  So, I think with respect to the

11   defendants who have been severed, unless anyone has an

12   objection, my proposal is that we set a status conference date

13   several months out.  I mean, we could set another trial date at

14   this point, but I don't think that we would be talking about

15   scheduling something in the middle part of next year if not

16   later.  And I'm not suggesting that we don't need to schedule

17   another trial sooner, but I just don't think at this point that

18   makes sentence, unless anybody disagrees with that.  Does the

19   government disagree with that?

20              MR. TRIPI:  No, your Honor.

21              THE COURT:  So why don't, we can set a status

22   conference date for the four defendants that have been severed

23   for -- why don't we set it for sometime in late March.  Let's

24   do -- why don't we say noon on Thursday, March 29th.  Any issue

25   with that?

1             MR. TRIPI:  No, your Honor.

2             MR. CATALANO:  No, your Honor.

3             MR. TRIPI:  Your Honor, as to speedy trial, as to

4     the severed group, may I be heard?

5             THE COURT:  Yes.

6             MR. TRIPI:  I ask that the time from today's date,

7     be the date the Court granted the severance up to and including

8     March 29th of 2018 be excluded from the calculations of the

9     speedy trial clock as to Mr. Caruso, Williams, Wood, and

10    Stacharczyck.  As this Court is aware, this case involves

11    numerous legal issues.  Those issues, as to those defendants,

12    will be addressed specifically by their counsel in a run up to

13    the trial.  Counsel now has access to the Jencks Act material

14    that will inform them on defense strategies and any motions in

15    limine that they will separately need to file, as it relates to

16    that follow-up trial.  The protective order in place allows for

17    defense counsel to review those materials and effectively

18    prepare for that secondary trial.  Obviously, defense counsel

19    will also be able to view the first trial or the main trial, as

20    it's been called here, which will also allow them to

21    effectively represent the defendants in the second trial.  The

22    trial will take place in a public courtroom, and they'll be

23    able to view witnesses, some of whom may also testify in the

24    separate trial.  That will allow for effective assistance of

25    counsel.  Based on the record before the Court, I would ask

1   that the time from today's date to March 29th, 2018, for the

2   now severed defendants, be excluded in the interest of justice

3   and for effective assistance of counsel pursuant to the Title

4   18 U.S.C 3161 (h)(7)(A) and 3161(h)(7)(B)(4), as that exclusion

5   would outweigh the public and the defendants' interest in a

6   speedier trial.

7              THE COURT:  Mr. Molloy, any objection on behalf of

8   Mr. Wood?

9              MR. MOLLOY:  No.  And on behalf of Mr. Pieri.

10              THE COURT:  In other words, on behalf of Mr.

11   Caruso, because you're appearing for Mr. Pieri, very good.

12              Mr. Okay, any objection on behalf of Mr.

13   Stacharczyck?

14              MR. OKAY:  No objection.

15              THE COURT:  Mr. Catalano, any objection on behalf

16   of Mr. Williams?

17              MR. CATALANO:  No, your Honor.

18              THE COURT:  I do find for the reasons just stated

19   on the record by Mr. Tripi in the interest of justice, the time

20   through March 29th, 2018, should be excluded with respect to

21   the trial of Mr. Caruso, Mr. Williams, Mr. Wood and Mr.

22   Stacharczyck.  I find that the interests of justice are

23   outweighed by the interests of the defendants and the public in

24   a more speedy trial with respect to those defendants, again,

25   for the reasons that were just stated on the record by Mr.

1    Tripi including the fact that it will allow all of these

2    defendants to prepare appropriately for trial, particularly

3    since the so-called main trial of this case will commence on

4    January 16th, 2018.  And, therefore, pursuant to 18 U.S.C.

5    3161(h)(7)(A) and (h)(7)(B)(4), the time through March 29th,

6    2018 with respect to those defendants is hereby excluded.

7              Mr. Connors?

8              MR. CONNORS:  Very quickly.  I have to report to

9    Judge Arcara because I have another trial scheduled in

10   February.  We have from time to time made estimates about the

11   length of the trial and I don't know if Mr. Tripi is in a

12   position to do that.  We now know we have a likelihood of seven

13   defendants in the trial beginning on January 16th, are we still

14   looking at an eight to ten-week trial or less or more.

15             MR. TRIPI:  I think I estimated 12 weeks or less.

16   I don't want to shrink it.

17             THE COURT:  I think everybody should plan on four

18   months.  That is what I'm planning on and that is what

19   everybody else should plan on.

20             MR. CONNORS:  You may hear from Judge Arcara.

21             THE COURT:  I'm always happy to talk to Judge

22   Arcara.  All right.  In terms of the defendants who obviously

23   we have a separate schedule with Mr. Jenkins in terms of the

24   defendants who are part of this so-called main trial, the

25   pretrial order that I issued has November 17, I believe, for

1    the briefing of any evidentiary issues, and December 1 for

2    various pretrial filings.  We have a pretrial conference

3    scheduled for December 12.  I'm anticipating we're certainly

4    going to have additional meetings after December 12, between

5    December 12 and the start of the trial on January 16th.  I'm

6    happy to schedule some additional dates at this point if

7    everybody thinks that makes sense or if you think it makes more

8    sense to wait until December 12 and kind of see where things

9    stand at that point?  Mr. Tripi, what is the government's view?

10             MR. TRIPI:  I prefer if we wait.  I think things

11   might be more in focus by December 12th.

12             THE COURT:  Any objection from defense counsel to

13   that?

14             MR. DEAL:  No.

15             THE COURT:  Anything else from the government with

16   respect to the severance issues that we need to deal with right

17   now?

18             MR. TRIPI:  Only one thing that I'll just

19   highlight.  We'll be filing a motion to modify the protective

20   order as it relates to the severed defendants in terms of

21   timing and sharing since they are not going to trial.

22   Obviously, counsel, has it already and I don't think there will

23   be a need for the defendants to have back material shared with

24   that now that the trial is shared with them.

25             THE COURT:  The date that they can have material

1    shared with them.

2              MR. TRIPI:  December 1st.

3              THE COURT:  If you can't reach an agreement with

4    defense counsel for the severed defendants and you need a

5    briefing schedule.  Make sure it gets briefed before December

6    1.

7              MR. TRIPI:  I will.

8              THE COURT:  Anything else from defense counsel on

9    the severance issues?  No?  Okay.  I want to address the

10   government's motion related to the Connors Firm.  And I also

11   want to address an issue with Mr. Mahoney and McIndoo.  Let's

12   deal with the Connors Firm issue first.  But I think I don't

13   know that we need any defendants here for that other than Mr.

14   Pirk.  Mr. Enix obviously isn't here.

15             MR. DEAL:  Mr. Jenkins can be excused?

16             MR. STACHOWSKI:  Mr. Olejniczak would like to hand

17   it to up to you, this has to do with his feelings about bail.

18             THE COURT:  About bail?

19             MR. STACHOWSKI:  Yes.

20             THE COURT:  I'm happy to take it, but I have to

21   give a copy to the government.

22             Any issue with Mr. McIndoo being here for the

23   discussion?

24             MR. CONNORS:  No.

25             THE COURT:  Other than Mr. McIndoo and Mr. Pirk, I

1     think all defense counsel and defendants are excused.

2               MR. STACHOWSKI:  It's talks about his health

3     issues.

4               THE COURT:  Okay.  I will have my chambers share a

5     copy with the government and we will decide what to do with it.

6               MR. STACHOWSKI:  That won't hurt.

7               THE COURT:  I'll decide what to do with it.

8               MR. STACHOWSKI:  If you can send a copy to me or

9     e-mail it, but I gave you the only one we had.

10              THE COURT:  Okay.  All right.  The record should

11    reflect that the government counsel is here and Mr. Connors and

12    Mr. Grable are here and Mr. Pirk is here as are Ms. Meyers Buth

13    and Mr. Easton, Mr. Pirk's counsel.  I have the government's

14    motion that was filed at docket 822, Notice of Motion and

15    motion to clarify the record regarding potential conflict of

16    interest on behalf of Connors, LLP, which is obviously

17    representing Mr. Enix in this case.  I take it, Mr. Connors,

18    Mr. Grable, you have a copy of this.

19              MR. CONNORS:  We did just receive it.  We haven't

20    had a chance to look at it.  I was out of town.

21              THE COURT:  Fair enough.  But we can -- you can

22    respond to it in writing.  I guess I want you to have an

23    opportunity to look at it and respond to it and then we can

24    conduct.  My understanding of my obligations, I first have an

25    obligation to inquire as to whether or not there is a potential

1      conflict.  And then if there is either an actual conflict or

2      potential conflict, then I have an additional obligation to

3      explore waiving the conflict.  But we're not even there at this

4      point.  We have to figure out if there even is a potential

5      conflict.

6                    MR. CONNORS:  We did talk about this at some

7      point, Mr. Tripi and I.  I am aware of the issue, but I don't

8      think this is an issue.  And maybe we'll put it to bed without

9      additional briefing.  I don't think you need any more papers.

10                   THE COURT:  If you're prepared to address it now,

11     I guess the question is, did your firm, at any point in time,

12     represent anyone involved in this case other than Mr. Enix.

13                   MR. CONNORS:  No, essentially what happened, we

14     received an inquiry by Mr. Pirk and Mr. Enix very early on to

15     look into whether there was an investigation to the club

16     itself, the entity to see if there was any exposure for the

17     corporation and determine whether or not there was any issues

18     that might affect them.  I actually put in a call to Joe Tripi

19     early on to find out information.  He understandably told me

20     that he couldn't share anything with me about the entity and to

21     stay tuned and essentially nothing else came of it other than

22     that.

23                   THE COURT:  So did your firm represent the entity

24     or the corporation.

25                   MR. CONNORS:  At the time we were asked to look at

1       it on behalf the Kingsmen Motorcycle Club seeing if there were

2       any problems ranging from forfeiture or potential indictment as

3       an organization.  And we looked at it.  It was quiet.  We

4       didn't ascertain any information from the prosecution and

5       basically we didn't pick up any confidential information that

6       would prohibit us from representing an individual when later it

7       turns out that all of the individuals were charged, not the

8       corporation.

9               THE COURT:  So, did you or anyone with your firm

10      have any conversations with Mr. Pirk that you would

11      characterize as confidential in nature.

12              MR. CONNORS:  We did meet with Mr. Pirk on one

13      occasion and Mr. Enix at the same time essentially asking us to

14      look out for the corporation.

15              THE COURT:  And did you have any conversations

16      with any other members of the Kingsmen Motorcycle Club, other

17      than -- alleged members of the Kingsmen Motorcycle Club, other

18      than Mr. Pirk or Mr. Enix?

19              MR. CONNORS:  Yes, I believe we did.  Someone that

20      is not part of these charges.  I believe he was, at the time,

21      he may have been an officer at the time.

22              THE COURT:  And who was that individual?

23              MR. CONNORS:  His name was William Piedlow.

24              THE COURT:  Do you know who?

25              MR. CONNORS:  William Piedlow, short conversation

1     with him.  He was president at the time and had some background

2     information about the corporation.

3                    THE COURT:  And there was an invoice or invoices

4     issued by your firm to the Kingsmen Motorcycle Club.

5                    MR. CONNORS:  That is true, directly to the

6     corporation.

7                    THE COURT:  And the corporation paid your firm?

8                    MR. CONNORS:  Exactly.

9                    THE COURT:  And the invoice or invoices are what

10    is the subject, Mr. Tripi, of your inquiry here?

11                   MR. TRIPI:  I've been made aware of one invoice,

12    I'm unaware, as there are more, and as I indicated, I have not

13    looked at it has Mr. Enix's name and Mr. Pirk and the Kingsmen

14    Motorcycle Club, that is what initially made me contact Mr.

15    Connors and inquire and then obviously file this motion.  I

16    believe that Mr. Connors and his firm doesn't think a conflict

17    exists.  Obviously our concern, we want to make sure if people

18    are convicted and potentially sentenced to long periods of

19    incarceration that this doesn't come up down the road and

20    change, as that may change, I want to get on the record if

21    there is a potential conflict, that Mr. Enix and Mr. Pirk are

22    waiving it, if necessary.

23                   THE COURT:  How many invoices are there?

24                   MR. CONNORS:  I'm not exactly sure.  I remember

25    this, though, we had a retainer and we returned a portion of

1    the retainer to the current organization hierarchy.

2              THE COURT:  At any time did you view Mr. Pirk as a

3    client of the firm?

4              MR. CONNORS:  No.

5              THE COURT:  And fair to state you didn't view Mr.

6    Enix as a client of the firm until after your representation of

7    the corporation?

8              MR. CONNORS:  That's correct.

9              THE COURT:  So really the issue is was the

10   representation of the corporation, does that in any way create

11   a potential conflict, either through representation of the

12   corporation or communications that you had with alleged

13   officers of the corporation in your capacity as attorneys for

14   the corporation?

15             MR. CONNORS:  I think that accurately sets forth

16   the issue.  We did not talk substance with any of the

17   individuals.

18             THE COURT:  I mean, it's certainly not unusual to

19   have a situation where a company is being criminally

20   investigated and then if criminal charges ultimately result,

21   that the attorney representing the company ends up representing

22   one of the officers or alleged officers of the company and then

23   other counsel is involved.

24             MR. CONNORS:  It has happened a number of times in

25   my career, your Honor.

1          THE COURT:  Right.  I mean, from the government's

2    perspective, do you think that we need to confirm with Mr. Pirk

3    and Mr. Enix that they waive any potential conflict.  In some

4    ways, I feel as though I'm a little in the dark because I

5    haven't seen the invoices.  I don't know what, Mr. Connors,

6    your view is of me reviewing the invoices ex parte without the

7    government having any access to them.

8          MR. CONNORS:  Let me think about that.

9          THE COURT:  That's fine.

10         MR. TRIPI:  There is a separate attorney in my

11   office that I'm walled off on, but, obviously, these came up in

12   the searches of various devices, so I walled myself of the

13   generic description of it.  I think having Mr. Pirk put

14   something on the record saying that he has no objection to the

15   current representation would be ultimately sufficient as long

16   as Mr. Enix was on the record.  I don't perceive it to be a

17   conflict based on what I'm hearing, but at the same time, I

18   think in an abundance of caution.

19         THE COURT:  I think, at best, it's a potential

20   conflict at best.  And I'm not sure it's that.  I guess Mr.

21   Easton or Ms. Meyers Buth, have you had any discussion with Mr.

22   Pirk about the potential conflict this creates?

23         MR. EASTON:  No, your Honor, not focused as it is

24   today.  We could have those conversations with Mr. Pirk.  I was

25   in the dark as to the sealed submission from the government.

1          MR. TRIPI:  It wasn't sealed, it was publically

2     docketed.

3          MR. EASTON:  So we're not in a position to talk.

4          THE COURT:  I think the most appropriate thing for

5     me to do, it doesn't strike me from what Mr. Connors has

6     described that there is any actual conflict, clearly not.  It

7     also doesn't strike me that there is even the real possibility

8     of a conflict.  At best, I think, as I said, there is a

9     potential for a conflict, but Mr. Connors hasn't identified any

10    confidential information that he learned in his representation

11    of the corporation that could create an issue in this case,

12    correct?

13         MR. CONNORS:  That's true.

14         THE COURT:  But I think the most prudent course of

15    action would be for me to confirm with both Mr. Pirk and Mr.

16    Enix, ultimately on the record, that they don't have any issue

17    with it.  And I'm not comfortable with doing it with Mr. Pirk

18    until he had an opportunity to talk to you and Ms. Meyers Buth

19    about this issue.  I'm assuming, and I guess if I'm asking an

20    inappropriate question, you can let me know that.

21         MR. CONNORS:  I will.

22         THE COURT:  I'm assuming there is a joint defense

23    agreement here?

24         MR. CONNORS:  Yes.  There is definitely an oral

25    joint defense agreement.

1          THE COURT:  So, I mean, you know that is the

2     natural progression of these things, usually with these kinds

3     of cases.  You have a the company that retains counsel because

4     there is an investigation, when the individuals get charged or

5     the company gets charged, you get additional attorneys, but the

6     initial attorney who is involved stays involved.  I mean, it's

7     not as though you conducted some independent kind of

8     investigation as to the nature of the allegations here and then

9     were offering opinion to the company on that issue.  Right?

10          MR. CONNORS:  That's true.  But even if I did

11     that, I don't think it would be a problem, but I didn't.

12          THE COURT:  All right.  Why don't we do this?  At

13     this point, I'm not concerned.  I don't have significant

14     concerns, but I do think the more prudent course of action

15     would be to have a colloquy with both Mr. Pirk and Mr. Enix on

16     the record to confirm that they do not have any concerns and

17     they've had ample opportunity to talk to their counsel about

18     any potential issue here.  So we can do that today or we can

19     schedule another time for it.

20          MR. TRIPI:  Judge, might I suggest, since you're

21     already having argument with Jenkins on November 7th.

22          THE COURT:  No, November 8th.

23          MR. TRIPI:  Maybe we can use that as the date to

24     have that.  I know Mr. Enix is in Florida, that will give him a

25     date to travel here and be present.

1           THE COURT:  Do you have any objection to Mr. Enix

2     appearing by video conference?

3           MR. TRIPI:  No.

4           THE COURT:  We can arrange for Mr. Enix to be at a

5     courthouse in Florida and appear by video conference.  Would

6     that work.

7           MR. CONNORS:  It would work.  I know we're working

8     on a date for him to come here, it's not as soon as that.

9           THE COURT:  Do you know approximately when?

10          MR. GRABLE:  He will be here, he will be in court

11    on December 12th the date of the pretrial conference and he

12    will be working with us both before and afterwards.

13          THE COURT:  I mean, right now, I'm supposed to be

14    here the entire month of November for a trial.  So, I'm going

15    to be around.  I think the more pressing issue in some ways is

16    Mr. Pirk.  So what is your availability, Mr. Easton, on

17    November 8th or for Mr. Pirk?

18          MR. EASTON:  I'll be out of the district, but Ms.

19    Meyers Buth would be available on that date.  And I think we

20    could do it then.

21          THE COURT:  That will give you enough time to talk

22    to Mr. Pirk about this and talk to Mr. Connors about any issues

23    in that regard, and we'll set this down for noon on Wednesday

24    November 8th to have a further colloquy with Mr. Pirk to

25    confirm that he doesn't have any concerns about a conflict.

1    And if there is any potential conflict, that he waives it.  And

2    I think with Mr. Enix, I think we're fine waiting until

3    December 12th.  I take it, Mr. Connors, your client obviously

4    is aware of the fact that that is how you initially got

5    involved in the case, and he is also aware of the work you did

6    in connection with the company, correct?

7              MR. CONNORS:  Yes, very true.

8              THE COURT:  Any issue with that, Mr. Tripi?

9              MR. TRIPI:  Not at all.

10             THE COURT:  All right.  Sounds good.  There is an

11   issue I need to deal with with Mr. Mahoney before we adjourn

12   for the day.  Right now, you should stay here, Mr. Tripi.  Mr.

13   McIndoo needs to stay.

14             Can we have Mr. McIndoo come down and sit at

15   counsel's table?

16             First of all, you filed a motion for

17   reconsideration, and I do, I'm going to set a briefing schedule

18   on that.  Two weeks for the government to respond, is that

19   sufficient?

20             MR. TRIPI:  Yes, Judge.

21             THE COURT:  All right.  You didn't ask for reply

22   papers, but where are you requesting?

23             MR. MAHONEY:  I would, Judge.

24             THE COURT:  So a week to submit reply papers and

25   I'll indicate in there, I'll decide whether or not we're going

1    to have oral argument based on the papers.  I'll set a text

2    order setting that issue.

3                    MR. MAHONEY:  Thank you.

4                    THE COURT:  You communicated to my Chambers, and I

5    don't want to reveal any confidences, you're going to have to

6    file at least publically a motion to file under seal what you

7    communicated with my Chambers.

8                    MR. MAHONEY:  I thought that was done.  I wasn't

9    involved in the filing process.

10                   THE COURT:  Nothing is on the public docket at

11   this point.  All that has occurred is your office sent an

12   e-mail to Ms. Duque.  You tell me, publically, what it is

13   you're requesting.  I don't want to reveal anything that feel

14   should be filed under seal.

15                   MR. MAHONEY:  Mr. McIndoo is eligible for

16   appointment of CJA.  He can no longer afford the attorney, he

17   retained us.  And so on his behalf, I'm making application for

18   CJA relief for him.  And basically set out that he exhausted

19   his assets or is about to exhaust the assets that he had

20   available to him for payment of counsel.  And that his parents,

21   who are present in the courtroom, it turns out are unable to

22   pay for the remaining services.

23                   THE COURT:  All right.  Mr. McIndoo, have you seen

24   the Financial Affidavit that is attached to your attorney's

25   motion papers?

1           DEFENDANT MCINDOO:  Yes.

2           THE COURT:  I need to have you sworn in and then

3   I'll ask you whether or not it's true.  Do you want to see

4   another copy of it?

5           DEFENDANT MCINDOO:  Yeah, I would like to

6   familiarize myself with it.

7           THE COURT:  Let's hand this down to.  All right.

8   So Mr. McIndoo, did you have an opportunity to look at the

9   Financial Affidavit?

10          THE DEFENDANT:  Yes.

11          THE COURT:  I'll ask my courtroom deputy to swear

12  you in.  She is right here, that is Ms. Duque.

13          (Whereupon, the defendant was sworn in by the

14  courtroom deputy.

15          Mr. McIndoo, have you had an opportunity to review

16  your Financial Affidavit dated April 21?  Why is it dated April

17  21, 2017?

18          MR. MAHONEY:  That may have been a typo, Judge.  I

19  don't know why.  It should have been -- should have been

20  October 21, 2017.

21          THE COURT:  Was this just recently completed?  I'm

22  going to hand it back and ask you to change the date of it and

23  maybe Mr. McIndoo can initial that.

24          Did he initial it?

25          MR. MAHONEY:  Yes, he did.  Right there.

1                THE COURT:  Mr. McIndoo, the record should reflect

2      I have in front of me a Financial Affidavit that has been dated

3      October 21, 2017.  Does that include your initials?

4                THE DEFENDANT:  Yes.

5                THE COURT:  And that includes your signature?

6                THE DEFENDANT:  Yes.

7                THE COURT:  And is the information contained in

8      this Financial Affidavit accurate?

9                THE DEFENDANT:  Yes.

10                THE COURT:  All right.  I do find, based on the

11     information contained in the Financial Affidavit that Mr.

12     McIndoo qualifies for assigned counsel.  And I will assign

13     counsel.  Mr. Mahoney, you've indicated your willingness to

14     continue as CJA appointed counsel, is that correct?

15                MR. MAHONEY:  Yes.

16                THE COURT:  Mr. McIndoo, do you desire to have Mr.

17     Mahoney continue as your counsel in this case?

18                THE DEFENDANT:  Yes.

19                THE COURT:  Any objection from the government?

20                MR. TRIPI:  We have no position in this case.

21                THE COURT:  So, I am going to appoint Mr. Mahoney

22     as CJA counsel in this case for Mr. McIndoo.  In terms of

23     sorting out he already incurred fees, I agree with your

24     representations as to what Mr. Trist told you, Mr. Mahoney,

25     that you have to factor in what should have been charged under

1    the CJA rate and back that out in terms of what happens with

2    the additional assets and so forth.  I guess I want to get some

3    additional guidance on that at this point.

4                   MR. MAHONEY:  I think either this is that hybrid

5    thing where the Court can direct payments be made into the

6    Court.  We'll hold the money in escrow and put it there and

7    there is also the motorcycle, we could have the money kept

8    aside in a separate account and later let the Court supervise

9    how that is disposed of.

10                  THE COURT:  But you have money right now, you have

11   an excess, technically money and then a trust account money.

12                  MR. MAHONEY:  We have in the trust account.

13                  THE COURT:  You have trust account.

14                  MR. MAHONEY:  I think the figure on that is the

15   combination of what remains in his account and what we have in

16   our account.

17                  THE COURT:  I'll make a direction at this point

18   nothing be done with those assets at this stage in terms of how

19   it's going to be utilized to pay for your services.  As I said,

20   I would like to get additional guidance for it before I make

21   any direction in that regard.  As of right now, we'll ask for

22   and arrange for an order to be prepared, you're hereby

23   appointed as Mr. McIndoo's CJA attorney.

24                  MR. MAHONEY:  Thank you very much.

25                  THE COURT:  Anything else we need to do with from

1    your perspective.

2              MR. TRIPI:  Nothing, your Honor.

3              MR. MAHONEY:  No.

4              THE COURT:  All right.  We're adjourned.  Thanks,

5    everyone.

6                         *   *   *

7                    CERTIFICATE OF REPORTER

8

9        I certify that the foregoing is a correct transcript of the

10   record of proceedings in the above-entitled matter.

11

12   S/ Karen J. Bush,  RPR

13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25